# EXHIBIT "A"

≋ EFILED IN OFFICE
CLERK OF STATE COURT
RICHMOND COUNTY, GEORGIA

**2018RCSC01222**

PATRICIA W. BOOKER
OCT 24, 2018 10:44 AM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

## IN THE STATE COURT OF RICHMOND COUNTY
## STATE OF GEORGIA

CHARVETTE E. MONROE, as Executrix of the
ESTATE OF MARGIE G. EVANS,

    Plaintiff,

v.

JOHNSON & JOHNSON, a Foreign Corporation,
JOHNSON & JOHNSON CONSUMER, INC., a
Foreign Corporation f/k/a JOHNSON &
JOHNSON CONSUMER COMPANIES, INC.,
IMERYS TALC AMERICA, INC., a Foreign
Corporation f/k/a LUZENAC AMERICA, INC.
f/k/a RIO TINTO MINERALS, INC., PTI
ROYSTON, LLC, a Georgia Limited Liability
Company d/b/a PHARMA TECH INDUSTRIES,
and JOHN DOE CORPORATIONS NO.s 1 – 10,

    Defendants.

CIVIL ACTION FILE NO.:

JURY TRIAL DEMANDED

### COMPLAINT

Plaintiff, CHARVETTE E. MONROE, as Executrix of the ESTATE OF MARGIE G.

EVANS, by and through counsel, files this complaint against Defendants, Johnson & Johnson

("J&J"), a foreign corporation, Johnson & Johnson Consumer, Inc., a foreign corporation f/k/a

Johnson & Johnson Consumer Companies, Inc. ("JJCI") (collectively "J&J Defendants"), Imerys

Talc America, Inc., a foreign corporation ("Imerys Talc"), PTI Royston, LLC, a Georgia limited

liability company d/b/a Pharma Tech Industries ("PTI"), and John Doe Corporations No.s 1 – 10

and alleges:

### INTRODUCTION

1.    MARGIE G. EVANS ("Margie") used Johnson's® Baby Powder ("Talc Products")

on a daily basis for 56 years for feminine hygiene.  To this day, the J&J Defendants and PTI

continue to tout the Talc Product's promise of "clinically proven mildness" and state that it is

"confirmed for purity," even though they have known for decades it contains asbestos and other materials known to be human carcinogens. Unaware of the danger posed by her prolonged use of the Talc Products, Margie used it all over her body, resulting in her ultimately developing the specific type of ovarian cancer scientifically linked to prolonged use. This action seeks redress for the Defendants' conduct, which shortened Margie's life, and caused great pain, anxiety, and suffering during her golden years after a 30-year elementary school teaching career and a lifetime of raising her family.

## PARTIES, JURISDICTION AND VENUE

2.      For the majority of her life, Margie was a Georgia citizen and she resided in Richmond County, Georgia, at the time of her death on March 12, 2018.[1]  Margie's first-born child, CHARVETTE E. MONROE, also a resident of Richmond County, has been appointed as the Executrix of the ESTATE OF MARGIE G. EVANS, and submits the sworn information required by O.C.G.A. § 51-14-7(a) (EXHIBIT A attached hereto).

3.      From approximately 1952 to at least 2008, Margie regularly used and was exposed to asbestos-containing Talc Products in Richmond County, Georgia, which was a substantial contributing factor to her diagnosis of ovarian cancer in October 2016.  During Margie's battle with ovarian cancer, she suffered two exploratory abdominal surgeries to remove the invading cancer; she endured months of weekly, and sometimes daily, medical appointments for infusions of chemotherapy and hydration; and experienced adverse effects from harsh medications and procedures.  Ultimately, 21 rounds of chemotherapy and a clinical trial proved unsuccessful. Margie was left with no hope of decreasing the aggressive cell growth in the terminal spread of

---

[1]  Margie was a widow, having survived her husband of 41 years, Charles H. Evans, and is now survived by two adult daughters, Charvette E. Monroe and Patrice Y. Evans.

her cancer.  Prior to her death, she endured physical and emotional pain, including her sorrow and fear of leaving her loved ones behind.  The last weeks of her life involved hospitalization and realization of her imminent death.

4.     As required by O.C.G.A. §§ 51-14-3(18)(B)(ii) & 51-14-6(2)(A), the Medical Report of Richard L. Kradin, M.D. attached hereto and incorporated as EXHIBIT B, attests that Margie's prolonged exposure to the asbestos-containing Talc Products, together with studies identifying the presence of talc and asbestos fibers in her tissues and lymph nodes, satisfy the prima-facie evidence of physical impairment with respect to asbestos exposure.

### Jurisdiction over J&J

5.     Defendant J&J is a withdrawn New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

6.     From the 1890s until the present day, J&J has been regularly engaged in the business of research and development, designing, formulating, manufacturing, testing, promoting, marketing, distributing and/or selling the Talc Products, or otherwise directed these activities.

7.     At times material hereto, the Talc Products were manufactured in Royston, Georgia, by J&J, directly or indirectly through PTI, at that location (the "Royston Facility").

8.     At times material hereto, J&J regularly solicited, transacted, and conducted business in Georgia by selling the Talc Products to residents and businesses throughout Georgia and by directly and indirectly manufacturing Talc Products at the Royston Facility.

9.     J&J transacts business within Georgia; committed a tortious act or omission within Georgia; committed a tortious injury in Georgia caused by an act or omission outside this state and regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; and/or owns,

uses or possesses real property situated within this state.  The causes of action against J&J arise

out of, or result from, its activities within Georgia.  Accordingly, pursuant to Georgia's long-arm

statute, O.C.G.A. §9-10-91, this court has personal jurisdiction over J&J.

10.     Personal jurisdiction complies with federal due process because J&J has minimum

contacts with Georgia such that suit does not offend traditional notions of fair play and substantial

justice, and J&J has purposefully availed itself of the privilege of conducting activities within

Georgia, thus invoking the benefits and protections of its laws.

11.     J&J may be properly served via the Georgia Secretary of State pursuant to O.C.G.A.

§ 14-2-1520.

### Jurisdiction over JJCI

12.     Defendant, JJCI, is a New Jersey corporation and a subsidiary of J&J.

13.     At times material hereto, JJCI has been authorized to do business in Georgia and

has its principal place of business at 199 Grandview Road, Skillman, New Jersey 08558.

14.     At times material hereto, JJCI was engaged in the business of research and

development of Talc Products.  Additionally, JJCI, in concert with J&J, designed, formulated,

manufactured, tested, promoted, marketed, distributed, and sold Talc Products, or otherwise

directed those activities.

15.     All Talc Products were manufactured at the Royston Facility by JJCI directly or

indirectly through PTI.

16.     At all times material hereto, JJCI regularly solicited, transacted, and conducted

business in Georgia by selling Talc Products to residents and businesses throughout Georgia and

by manufacturing Talc Products in at the Royston Facility until 2005, and thereafter by indirectly

manufacturing Talc Products at the Royston Facility through PTI.

4

17.   Because JJCI was authorized to do business in Georgia when the claim arose, it is deemed a Georgia resident for purposes of personal jurisdiction and may be sued to the same extent as a domestic corporation.

18.   Additionally, this court has personal jurisdiction over JJCI pursuant to Georgia's long-arm statute, O.C.G.A. §9-10-91, because JJCI transacts business within Georgia; committed a tortious act or omission within Georgia; and owns, uses or possesses real property situated within this state.   The causes of action against JJCI arise out of, or result from, its activities within Georgia.

19.   Further, personal jurisdiction complies with federal due process because JJCI has minimum contacts with Georgia such that this suit does not offend traditional notions of fair play and substantial justice, and JJCI has purposefully availed itself of the privilege of conducting activities within Georgia, thus invoking the benefits and protections of its laws.

20.   JJCI may be properly served via its registered agent, Corporation Process Company, at 2180 Satellite Blvd., Suite 400, Gwinnett County, Duluth, Georgia 30097.

**Jurisdiction over Imerys Talc**

21.   Defendant, Imerys Talc, is a Delaware corporation authorized to do business in Georgia since 1994.

22.   At all times material hereto, Imerys Talc was in the business of mining, processing, testing, formulating, manufacturing, distributing, marketing, supplying, and selling the mineral, talc, for use in the Talc Products, which was delivered, further manufactured and/or processed, assembled and packaged at the Royston Facility.

5

23.    Because Imerys Talc was authorized to do business in Georgia when the claim arose, it is deemed a Georgia resident for purposes of personal jurisdiction and may be sued to the same extent as a domestic corporation.

24.    Additionally, this court has personal jurisdiction over Imerys Talc pursuant to Georgia's long-arm statute, O.C.G.A. §9-10-91, because Imerys Talc transacts business within Georgia; committed a tortious act or omission within Georgia; and owns, uses or possesses real property situated within this state, including real property at 100 Mansell Court East, Suite 300, Roswell, GA, 30076.  The causes of action against Imerys Talc arise out of, or result from, its activities within Georgia.

25.    Further, personal jurisdiction complies with federal due process because Imerys Talc has such minimum contacts with Georgia that maintenance of this suit does not offend traditional notions of fair play and substantial justice, and Imerys Talc has purposefully availed itself of the privilege of conducting activities within Georgia, thus invoking the benefits and protections of its laws.

26.    Imerys Talc's principal place of business is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076, because that is the "nerve center" of its business activities – the place where its high-level officers direct, control, and coordinate the corporation's activities.

27.    In addition to housing corporate and executive offices of Imerys Talc, the Roswell, Georgia office also is the site where day-to-day control of Imerys Talc is exercised, where exclusive decision making occurs, where a significant amount of managerial authority is located, where corporate records and bank accounts are kept, where the board of directors and stockholders meet, where executives live, have their offices, and spend their time, and where the corporate income tax is filed.

28.     Roswell, Georgia is designated in the corporate charter of Imerys Talc and is where: a) major policy, b) advertising, c) distribution, d) accounts receivable departments and e) financial and legal decisions originate.

29.     The global IT, marketing and talc supply decisions of Imerys Talc are directed, controlled and coordinated from Roswell, Georgia, and its accounting and legal decisions are directed, controlled and coordinated from the Roswell office.

30.     Thus, Imerys Talc has its principal place of business in Roswell, Georgia.

31.     Imerys Talc may be properly served via its registered agent, CT Corporation Systems, 1201 Peachtree Street, N.E., Fulton County, Atlanta, Georgia 30361.

### Jurisdiction over PTI

32.     Defendant, PTI was incorporated in Delaware and has its principal place of business at 545 Old Elbert Road, Royston, Georgia 30662.

33.     At times material hereto, PTI manufactured, tested, screened, formulated, processed, assembled, packaged, labeled and distributed powder products for use and sale, including the Talc Products.

34.     PTI is authorized to do business in Georgia.  It is wholly owned by Broadview Investments, LLC, a Delaware corporation.  The sole manager-member of both PTI and Broadview Investments, LLC is a citizen of Georgia.

35.     PTI may be properly served via its registered agent, Troy W. Bryce, 297 Prince Avenue, Suite 11, Clarke County, Athens, GA 30601.

**Subject Matter Jurisdiction**

36.     This court has jurisdiction over this matter pursuant to the Constitution of Georgia, Art. 6, § 1, ¶¶ I and IV, O.C.G.A. §§ 51-14-1 et seq., and the common and statutory laws of Georgia.

**Venue**

37.     Venue is proper in Richmond County, Georgia pursuant to O.C.G.A. § 51-14-10 because Plaintiff resided there and her exposure to asbestos took place there.  Venue is proper as to all other Defendants in Richmond County pursuant to Art. 6, § 2, ¶ IV, because all Defendants are joint-tortfeasors.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Overview of Talc Products Used by Margie

38.     The term "Talc" refers to both mineral talc and industrial mineral products that are marketed under the name talc and contain approximately 35% to 100% mineral talc.

39.     Talc is an inorganic, hydrated magnesium silicate mineral mined from the earth for many industrial, commercial and cosmetic uses.

40.     In its loose form, crushed into powder for personal care and cosmetic purposes, talc is known as "talcum powder" and is the main substance or component in the Talc Products at issue in this case.

41.     The ingredients on the label of Johnson's Baby Powder are disclosed only as "Talc, Fragrance."

42.     Geologically, the mineral talc occurs in rock mases, often coexisting with other hydrated magnesium silicate minerals, including asbestos.  Talc rock therefore often contains a mix of a wide variety of other minerals.

43.     Asbestos is a commercial and legal term referring to six unique minerals – chrysotile, actinolite, amosite, crocidolite, anthophyllite and tremolite – belonging to the serpentine and amphibole families of inorganic minerals, which crystallize into fibers in an asbestiform habit. All these forms of asbestos are carcinogenic to humans.

44.     Talc particles are normally plate-like, but may also form as true mineral fibers, which, like asbestos, are formed in the asbestiform habit.

45.     Anthophyllite asbestos and tremolite asbestos have been identified in the same talc mines that supply the talcum powder for the Talc Products used by Margie.

46.     Chemically, talc and anthophyllite are very similar in structure, appearance and chemical make-up and have been known to occur together.

47.     Since the 1960's, during Margie's daily use, Talc Products have contained asbestos, including but not limited to anthophyllite and tremolite.

48.     Through analytical microscopy, Plaintiff has confirmed the presence of platy talc, asbestiform talc, tremolite asbestos, anthophyllite asbestos, and transitional fibers in Talc Products that were regularly and frequently used by Margie.

49.     After her death, tissue digestion studies of Margie's autopsy tissues confirmed the presence of platy talc, asbestiform talc fibers, anthophyllite asbestos and tremolite asbestos in her tissues and lymph nodes.

50.     The Talc Products should only contain platy talc and fragrance.

51.     The Talc Products should not contain any asbestiform minerals.

52.     The presence of asbestiform minerals in the Talc Products is not a design specification.

9

**Margie's Use of the Talc Products**

53.     From approximately 1952 until at least 2008, Margie used the Talc Products to dust her perineal area and other parts of her body on a daily basis; a use that was reasonably foreseeable and expected by Defendants. During this dusting period, Margie inhaled the Talc Products, components of which were retained in her lungs.

54.     Margie was diagnosed with ovarian cancer of the serous subtype, a disease that has a long latency period, and does not arise until after prolonged use of the Talc Products.

55.     Margie was never warned that her prolonged use and inhalation of the Talc Products could significantly increase her risk for developing ovarian cancer.

56.     During the time that Margie used the Talc Products, she had no knowledge of an increased risk of developing ovarian cancer from prolonged perineal use of the Talc Products.

57.     If Margie had been warned of the increased risk of ovarian cancer associated with the Talc Products, she would not have used, or would have discontinued her use of, the Talc Products.

58.     When Margie was diagnosed with ovarian cancer, she was not aware that this disease was caused by using the Talc Products. She was not aware that the Talc Products contained asbestos. Accordingly, the statute of limitations did not begin to run until prima-facie evidence of physical impairment from asbestos is obtained.

59.     Defendants have engaged and continue to engage in fraudulent conduct by which they intend to conceal the present cause of action from Margie. Specifically, they have deliberately misled regulatory agencies as to the true nature of the Talc Products to avoid having them listed as carcinogenic. They have affirmatively misrepresented to Margie and the general public that

their Talc Products do not contain asbestos, and publicly denied that the Talc Products pose a risk to consumers, including Margie.

60.    As a direct and proximate result of the acts and omissions of the Defendants, Margie suffered injuries and damages including unnecessary disease, substantial physical and emotional pain and suffering; physical and mental anguish; anxiety; discomfort; hardship; distress; inconvenience; physical impairment; disfigurement and scarring resulting from otherwise preventable surgery; wounds and personal injuries through otherwise preventable surgery; loss of enjoyment of life; loss of personal dignity; loss of privacy and well-being; wrongful death and other consequential damages, all of which are permanent, and for which Plaintiff is entitled to recover compensatory damages in an amount to be determined by the jury.

### PTI'S Role as a Manufacturer of Talc Products

61.    PTI is not a contract manufacturer or product reseller that merely blends, bottles and packages the Talc Product.

62.    PTI holds itself out as a "core expert in topical powders" and manufacturers over 50 million pounds of Talc Products each year.

63.    PTI's ability to make every single component of a product in its Royston Facility sets it apart from traditional contract manufacturers, who merely take a product and package it, PTI made every single component of the Talc Products at issue in this case in its Royston Facility.

64.    A "defining moment" in PTI's history was in 2005 when, through an Asset Purchase Agreement, it acquired the Royston Facility and other assets from the J&J Defendants, who were then using the Royston Facility to manufacture Talc Products used by Margie.

65.    According to PTI's CEO Edward (Tee) Nolan: "The start-up of the facility – integrating it from being a J&J facility to a PTI facility – was a tech transfer in itself. We had to

11

build a new ERP system and basically build all of our systems from the ground up, as well as transform the operation from an in-house to external manufacturing approach."

66.     Before August 29, 2005, the J&J Defendants manufactured, tested, screened, formulated, processed, assembled, packaged, labeled and distributed Talc Products used by Margie from its Royston facility.  The J&J Defendants then ceased to manufacture Talc Products used by Margie.

67.     From at least as early as August 29, 2005 to present, PTI, manufactured, tested, screened, formulated, processed, assembled, packaged, labeled and distributed Talc Products used by Plaintiff from its Royston Facility.

68.     After PTI's acquisition of J&J assets and the Royston Facility, it continued to design and manufacture the same Talc Products used by Margie and previously manufactured by the J&J Defendants at the Royston Facility.  Accordingly, PTI had an active role in the production, design, or assembly of the Talc Products used by Margie and placing them in the stream of commerce.

69.     After PTI became the manufacturer of Talc Products, its cGMP ("current Good Manufacturing Processes") services included "manufacturing, packaging, injection molding, technology transfer, project management, process and packaging development, and quality assurance testing" for Talc Products used by Margie.

70.     Although Talc Products may be manufactured to the J&J Defendants' specifications, PTI has a substantial role and, at least as early as August 29, 2005, it had the exclusive responsibility, for all facets of Talc Products' manufacturing process, including but not limited to the sanitization of the talcum powder, quality control and assurance during the

manufacturing process and analytical testing to ensure that the Talc Products met design specifications and were free of asbestos and other impurities.

71.     At all times material hereto, PTI has had input in or has been actively involved in the design, concept, or specifications of Talc Products, including but not limited to materials procurement, analytical testing, supplier management and quality assurance auditing.

72.     At all times material hereto, PTI was responsible for perfecting the manufacturing process and test methods to ensure content uniformity in support of product label claims and was an extension and guardian of Talc Products' brand promise.

### The Dangers Posed by Asbestos and Talc

73.     The carcinogenic effects from exposure to asbestos and talc have been well-documented in medical and scientific literature for decades, including that exposure to asbestos leads to the development of ovarian cancer.

74.     Although Defendants knew of the existence of such medical and scientific literature, they have concealed it from the public and commissioned their own, faulty studies to support their own affirmative misrepresentations about the safety of the Talc Products.

75.     Over the last half of the 20th Century, multiple scientific studies confirm that asbestos and talc are biopersistent, and over decades can translocate and accumulate in distant human organs and lymph nodes.

76.     Talc is linked to the development of lung cancer and mesotheliomas and poses a statistically significant increased risk of developing ovarian cancer.

77.     Experimental animal studies and observations in human materials show exposure to asbestos and talc may be associated with ovarian and cervical tumors.

13

78.     Scientific studies show talc fibers in the asbestiform habit are more pathogenic than platy talc.

79.     Because of concerns about their respective health hazards, the use of asbestos is banned in more than 50 countries, and the use of talcum powder is banned in 28 countries around the globe.

80.     Due to the potential for translocation of microscopic mineral particles to distant organs and tissues, scientific researchers were concerned about the carcinogenic nature and effects of the use of talcum powders for genital use. In 1968, L.J. Cralley et. al. found that while talcum powders contained mostly talc, they also averaged 19% fiber content of tremolite, anthophyllite and chrysotile, and cautioned that use without precautions "may create an unsuspected problem."

81.     In 1971, researchers found a link between the use of talc powder and ovarian cancer. Researchers in Cardiff, Wales discovered talc particles embedded on 75% of the ovarian tumors they examined, and this research concluded "further investigations are obviously required." (Henderson, et. al. Talc and Carcinoma of the Ovary and Cervix, *BJOG*, March 1971; 78: 266-272).

82.     In 1982, Daniel Cramer, M.D. conducted the first epidemiologic study on genital use of talcum powder ("the "Cramer I Study") pursuant to a grant from National Institutes of Health ("NIH"). The Cramer I Study found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the ovary, in turn causing foreign body reaction and growth of epithelial ovarian tissue. The Cramer I Study found a statistically significant 92% increased risk of ovarian cancer from genital talc use and proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer.

14

83.     Since publication of the Cramer I Study in 1982, physicians, doctors and scientists throughout the world have conducted more than 37 studies which primarily showed a statistically significant increased risk of ovarian cancer with genital talc use.   These studies found the following:

a)  A 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. (Hartge, P., *et al.* Talc and Ovarian Cancer. *JAMA.* 1983; 250(14):1844).

b)  A 40% increase in risk of ovarian cancer in women that used talcum powder on their genital area. (Whittemore AS, *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* 1988 Dec; 128(6):1228-40).

c)  A 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once a week. (Booth, M., *et al.* Risk factors for ovarian cancer: a case-control study. *Br J Cancer.* 1989 Oct; 60(4):592-8).

d)  An 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. (Harlow BL, *et al.* Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol.* 1992 Jul; 80(1):19-26).

e)  A 70% increased risk from genital talc use and a 379% significantly increased risk of ovarian cancer in women who used talc on sanitary napkins. (Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5).

f)  An elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. (Yong Chen, *et al.*, Risk

Factors for Epithelial Ovarian Cancer in Beijing, China, 21 *Int. J. Epidemiol.* 23-29 (1992)).

g) A 27% increased risk in ovarian cancer for women who regularly used talc in the abdominal or perineal area. (Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84).

h) A 97% increased risk of ovarian cancer in women who used a "moderate" or higher use of talc-based powders in their genital area. (Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8).

i) A statistically significant 60% to 90% increased risk of developing ovarian cancer in 313 women with ovarian cancer and 422 women without this disease who performed any perineal dusting or used genital deodorant spray. (Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65).

j) A statistically significant increased risk of 42% for ovarian cancer for women who applied talc directly or via sanitary napkins to their perineal area. (Chang, S, *et al.* Perineal talc exposure and risk of ovarian carcinoma. *Cancer.* 1997 Jun 15; 79(12):2396- 401).

k) A 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. (Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol.* 1998 Aug; 179(2):403-10).

l) A 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area, and an 80% increase in risk for women with over 10,000 lifetime

16

applications. The ("Cramer II study"). (Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer.* 1999 May 5; 81(3):351-56).

m) A statistically significant 50% increased risk of ovarian cancer from genital talc use in women. (Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000 Mar; 11(2):111-7).

n) A statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. This study also examined women's use of cornstarch powders as an alternative to talc and found no increased risk of ovarian cancer in women in the cornstarch group, supporting a safe alternative to talc for genital use. (Mills, PK, *et al.* Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer.* 2004 Nov 10; 112(3):458-64).

o) A conclusion that talc may contribute to ovarian carcinogenesis in humans. (Buz'Zard, *et al., Phyto therapy Research: PTR* 21, no. 6 (June 2007): 579–86).

p) A 36% statistically significant increased risk for all types of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a highly significant dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer (and all serous invasive ovarian cancer). (Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemies Biomarkers Prev.* 2008 Sep; 17(9):2436-44).

q) An overall statistically significant 53% increased risk of ovarian cancer from genital talc use that established the risk of ovarian cancer increased with increasing frequency and

17

duration of talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

r) A 27% increased risk of ovarian cancer from genital talc use. (Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42).

s) A 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use and suggesting avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence. (Terry, KL, *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila).* 2013 Aug; 6(8):811).

t) A 30-60% increase in ovarian cancer with talc use from a meta-analysis of all accumulated epidemiologic evidence from almost all well-designed studies. (Ness, R. Does talc exposure cause ovarian cancer? *Intl. Jnl Gyn Cancer.* 25 Suppl 1 (May 2015):51).

u) A 33% increased risk of ovarian cancer, with a trend for increasing risk by talc-years. In addition, subtypes of ovarian cancer more likely to be associated with talc included invasive serous and endometrioid tumors and borderline serous and mucinous tumors. The ("Cramer III study). (Epidemiology (Cambridge, Mass.), December 17, 2015).

v) A 44% increased risk of Epithelial Ovarian Cancer and a dose–response relationship was found for duration of use and number of lifetime applications. The study concluded that body powder is a modifiable risk factor for epithelial ovarian cancer among African-American women and should be avoided. (Schildkraut JM, et al. Association between Body

Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). *Cancer epidemies Biomarkers prey; 25(10); 1411–7).*

w) A 33% increased risk of epithelial ovarian cancer with use of talc, with a trend for increasing risk by number of years of talc use. Cramer DW, et al. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology.* 2016; 27, 334-46.

84.   In February 2006, the International Association for the Research of Cancer (IARC) published a paper classifying genital use of talc-based powder as a "Group 2B" possible human carcinogen.  It concluded that world-wide studies consistently found an increased risk in ovarian from perineal talc use.  IARC found that between 16-52% of women world-wide were dusting their perineum with talc and an increased risk of ovarian cancer existed in such users ranging from 30-60%.

85.   In 2006, the Canadian government classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System.   Asbestos is also classified as "D2A."

### Defendants' Marketing and Advertising of Talcum Powder

86.   At all times material hereto, the Talc used for the Talc Products was taken from mines located in Vermont, Italy and China.

87.   Imerys Talc holds itself out as the world's leading talc producer, with mines and processing plants located on 5 continents.  At all times material, Imerys Talc actively engineered, designed, developed, formulated, processed, refined, milled, tested, cleansed, and manufactured talc for the Talc Products.

88.     Imerys Talc continually advertised and marketed its talc as safe for human consumption and use, and knew that its processed talc was intended for perineal and genital use.

89.     At all times material hereto, the J&J Defendants and/or PTI continually labeled, marketed and/or advertised or otherwise represented, that the talc used in the Talc Products, was safe for human use, when used as directed and expected.

90.     At all times material hereto, the J&J Defendants and/or PTI labeled, marketed, advertised or otherwise represented JOHNSON'S® Baby Powder as a product for babies and women that could be trusted as fresh, clean, and safe with "clinically proven mildness." It was marketed for daily use by babies and women to eliminate friction on the skin, to absorb excess moisture, to help keep skin feeling dry and comfortable, and that it was "clinically proven" to be safe, gentle and mild. In its labeling, marketing and advertisements, the J&J Defendants and/or PTI encouraged women to dust themselves, including in the perineal area, with JOHNSON'S® Baby Powder to absorb moisture, mask odor, and make them feel soft, fresh and comfortable.

91.     Similarly, at all times material hereto, the J&J Defendants and/or PTI labeled, marketed, advertised or otherwise represented Johnson & Johnson's® Shower to Shower as safe for use by women for feminine hygiene, including use in the perineal area. In 1998, advertising for this product included a catchy jingle that said: "Just a sprinkle a day, helps keep odor away.... Have you had your sprinkle today?" Advertisements for this product included the following statements to women: "Your body perspires in more places than just under your arms. Use Shower to Shower to feel dry, fresh, and comfortable throughout the day!" Women also were told in advertisements that Shower to Shower "can be used all over your body." Additionally, the label on back of the bottles referred to it in capital letters as a "DEODORANT BODY POWDER" and described it as a "UNIQUE, DEODORANT SYSTEM" that "helps to neutralize odor and keep

you drier..."   The back label also stated in capital letters: "ALL OVER DEODORANT PROTECTION."

92.    Although marketing and advertising for the Talc Products have changed over time, the message has remained the same, *i.e.,* the Talc Products are safe for babies and women, when used as directed and expected.

<u>**Failure to Warn Consumers of the Cancer Risk**</u>

93.    At no time did any of the Defendants warn consumers of an increased risk of ovarian cancer linked to perineal use of the Talc Products.

94.    Nothing on the label or other advertising or marketing informed consumers that the Talc Products contained asbestos or that the use of the Talc Products in the genital area may increase the risk of ovarian cancer.

95.    From 2006 to the present, the Imerys Defendants provided its customers, including the J&J Defendants and PTI, with Material Safety Data Sheets ("MSDS") for talc that conveyed health and warning information about the carcinogenic nature of talc – a warning that the J&J Defendants and PTI ignored and failed to pass onto the purchasers of the Talc Products.

96.    Other similarly situated manufacturers of talcum-based baby powders recognized the risks associated with perineal use and include warnings to consumers that "Frequent application of talcum powder in the female genital area may increase the risk of ovarian cancer."

97.    The Defendants have reaped - and continue to reap - enormous profits from their failure to warn, and deceptive labeling, marketing, advertising and sale of the Talc Products.

<u>**Defendants' Involvement in the Talc Interested Party Task Force**</u>

98.    Upon information and belief, in response to safety issues related to talc and talc-based body powders, the Cosmetic Toiletry and Fragrance Association now known as Personal

Care Products Council ("PCPC"), formed the Talc Interested Party Task Force ("TIPTF") in anticipation of litigation-related safety issues. The TIPTF periodically convened, including in the 1980s, to defend talc in response to epidemiologic studies which found an association between ovarian cancer and genital talc use. The task force again convened in or around 1992 to combat the United States National Toxicology Program's study. The J&J Defendants and Imerys Talc were primary actors and contributors to the TIPTF.

99.     The stated purpose of the TIPTF was to pool financial resources of these companies to collectively defend the use of talc and, specifically, talc-based body powders at all costs, in anticipation of future litigation, ensure self-regulation, and to prevent local, state or federal regulation of any type over this industry. The Defendants wielded considerable influence on the TIPTF. The TIPTF hired scientists to perform biased research regarding the safety of talc. Members of TIPTF, including some of the Defendants, edited reports of the scientists hired by this group before they were submitted to governmental agencies and/or released to the consuming public.

100.    Members of TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on local, state and federal regulatory bodies regarding talc. These activities were conducted by the Defendants over the past four (4) decades to prevent regulation of talc and to create confusion in the consuming public about the carcinogenic nature of talc.

101.    At all times material hereto, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc-based body powder and acted as a mouthpiece for the members of the TIPTF, including the Defendants. Completely reliant on funding from cosmetic-industry companies, PCPC was motivated to defend talc and talc-based body powders

22

to retain its members and their revenues. Upon information and belief, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales. In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating a direct pecuniary interest in defending the safety of talc, talc-based body powders and the Talc Products.

102. In and around the mid-1970s, the Cosmetic Ingredient Review ("CIR") was formed to give PCPC and the cosmetic industry more credibility for self-regulation. Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although the Defendants have, at all material times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC and its employees are paid by PCPC.

103. Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1,800 ingredients to be "safe as used." Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances. Over the course of these annual meetings, the panel can review about 500 ingredients per year. On average, the panel spent about 20 minutes discussing the safety of each ingredient.

104. Even though PCPC knew of the safety concerns surrounding talc and talc-based body powders for almost three (3) decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, the Defendants, and PCPC, influenced the CIR scientists writing and performing the review and, ultimately, edited the reviews in a biased

23

manner.  Not surprisingly, when CIR published its final report in 2015, it found talc to be safe for use in cosmetics.

### Defendants' Successor-In-Interest Liability

105.    J&J Defendants are also liable as a successor in interest to American Talc Company, Metropolitan Talc Company, Inc., Charles Mathieu, Inc. and Resource Processors, Inc.

106.    Additionally, the J&J Defendants are the successor-in-interest to Windsor Minerals, Inc., which owned, operated, mined, milled, manufactured, refined, sold, supplied, marketed, and/or removed talc, including asbestos-containing talc, or asbestos-containing products, that Plaintiff Margie Evans used or to which she was exposed.  Further, the J&J Defendants are the successor-in-interest to the presently unknown corporations, partnerships and/or other business entities who owned, operated, mined, milled, manufactured, refined, sold, supplied, marketed, and/or removed talc, including asbestos-containing talc, or asbestos-containing products, that were included in the Talc Products used by Plaintiff.

107.    Imerys Talc is also liable as a successor in interest to Luzenac America, Inc. and Rio Tinto Minerals, Inc.  Rio Tinto Minerals, Inc. became Luzenac America, Inc., which changed its name to Imerys Talc America, Inc.  All allegations as to Imerys Talc pertain to that entity when it was known as either Rio Tinto Minerals, Inc. or Luzenac America, Inc. or thereafter.

108.    Imerys Talc also is the successor in interest to Vermont Talc, Inc., Cyprus Minerals Co. and Windsor Minerals, Inc., which owned, operated, mined, milled, manufactured, refined, sold, supplied marketed, and/or removed talc, including asbestos-containing talc, or asbestos-containing products, that Plaintiff Margie Evans used or to which she was exposed.  Further, the Imerys Defendants are the successor-in-interest to the presently unknown corporations, partnerships and/or other business entities who owned, operated, mined, milled, manufactured,

24

refined, sold, supplied, marketed, and/or removed talc, including asbestos-containing talc, or asbestos-containing products, that were included in the Talc Products used by Plaintiff.

### Alter-Egos

109. The J&J Defendants operate as alter egos or business conduits with a unity of interest and common control and organization. JJCI was so organized and controlled and its business conducted in such a manner as to make it was merely an agency, instrumentality, adjunct, or alter ego of J&J. Thus, the separate and distinct legal existence possessed by JJCI, should be disregarded, because it served as a mere alter ego or business conduit of J&J. Accordingly, the acts of JJCI are chargeable to J&J.

### Joint Enterprise

110. The Defendants entered into a joint enterprise with each other because they combined their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, but the arrangement did not establish a partnership. In doing the acts alleged herein, the Defendants were acting in the course and scope of such joint enterprise. Accordingly, the Defendants are liable for the negligence and wrongful acts of each other.

## COUNT I
## STRICT LIABILITY FAILURE TO WARN AGAINST ALL DEFENDANTS

111. Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

112. The Talc Products used by Margie were manufactured in whole or in part by each of the Defendants, directly or indirectly.

113. The Talc Products were sold as new, in Richmond County, Georgia.

114. The Defendants knew that talc, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

115.   When the Talc Products manufactured and supplied by the Defendants were sold to Margie, they were not merchantable and reasonably suited to the use intended because the Defendants failed to provide adequate warning or instruction to consumers, including Margie, that the Talc Products, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

116.   The Talc Products were expected to and did reach Margie in Richmond County, Georgia, without a substantial change in condition.

117.   Due to the absence of any warning or instruction by any of the Defendants, Margie was unaware that her use of the Talc Products created an increased risk of ovarian cancer, as this risk was not known to the general public.

118.   Defendants are equitably estopped from raising the defense of the statute of repose, because Margie reasonably relied on a fraudulent act or statement by the Defendants that occurred after her injury accrued and, because of that fraud, Margie did not file suit until after the repose period expired.   The fraudulent act or statement by the Defendants referred to herein *supra* is specifically incorporated by reference into this count.

## COUNT II
## STRICT LIABILITY BASED ON DESIGN DEFECT AGAINST ALL DEFENDANTS

119.   Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

120.   The Talc Products used by Margie were manufactured in whole or in part by each of the Defendants, directly or indirectly.

121.   The Talc Products were sold as new in Richmond County, Georgia, directly or through a retailer.

26

122.   Defendants knew or should have known that talc, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

123.   When the Talc Products manufactured and supplied by the Defendants were sold to Margie, they were not merchantable and reasonably suited to the use intended and thus, defectively designed, because the foreseeable risk inherent in the design of the Talc Products far outweighed the utility or benefit derived from the Talc Products when applied to the female perineal area.

124.   The Talc Products created significant risks to the health and safety of consumers that far outweighed the risks posed by other products on the market used for the same therapeutic purpose.

125.   A reasonable and safer alternative design existed, which could have feasibly been employed by the Defendants to manufacture a product with the same therapeutic purpose as the Talc Products. Despite knowledge of this reasonable and safer alternative design, the Defendants failed to alter the Talc Products' design and formulation. The magnitude of the danger created by the Talc Products far outweighed the costs and risks associated with using an alternative, safer design.

126.   The Defendants knew that cornstarch is an organic carbohydrate which can be used by humans with no adverse health effects when used in the perineal area and has substantially the same effectiveness as talcum powder.

127.   The Defendants failed to act reasonably in choosing from among alternative product designs given the probability and seriousness of the risk posed by the design of the Talc Products, the usefulness of the Talc Products in that condition, and the burden on the Defendants

to take the necessary steps to eliminate the risk, and adopt the safest feasible one, because they knew that cornstarch was a safe and feasible alternative to the talcum powder used in the Talc Products, but failed to design the Talc Products with cornstarch.

128.   At all times material hereto, the Talc Products were expected to and did reach Margie without a substantial change in condition.

129.   The Defendants are equitably estopped from raising the defense of the statute of repose, because Margie reasonably relied on fraudulent acts or statements by the Defendants that occurred after her injury accrued and, because of that fraud, Margie did not file suit until after the repose period expired.   The fraudulent act or statement by the Defendants referred to herein *supra* is specifically incorporated by reference into this count.

## COUNT III
## STRICT LIABILITY BASED ON MANUFACTURING DEFECT AGAINST ALL DEFENDANTS

130.   Plaintiff hereby incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

131.   The Talc Products used by Margie were manufactured in whole or in part by each Defendants, directly or indirectly.

132.   The Talc Products were sold as new, in Richmond County, Georgia, directly or through retailers.

133.   The Defendants knew or should have known that talc, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

134.    When the Talc Products manufactured and supplied by the Defendants were sold to Margie, they were not merchantable and reasonably suited to the use intended and thus, were defectively manufactured, because they departed from the design specifications.

135.    At all times material hereto, the Talc Products were expected to and did reach Margie without a substantial change in condition.

136.    The Defendants are equitably estopped from raising the defense of the statute of repose, because Margie reasonably relied on a fraudulent act or statement by the Defendants that occurred after her injury accrued and, because of that fraud, Margie did not file suit until after the repose period expired.  The fraudulent act or statement by the Defendants referred to herein *supra* is specifically incorporated by reference into this count.

## COUNT IV
## NEGLIGENT FAILURE TO WARN AGAINST ALL DEFENDANTS

137.    Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

138.    The Talc Products used by Margie were manufactured in whole or in part by each Defendant, directly or indirectly.

139.    The Defendants knew that talc, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

140.    Because the Defendants knew of the increased risk of developing ovarian cancer from perineal use of the Talc Products, they had a continuing duty to warn consumers, including Margie, of the risk of harm, so consumers could make informed decisions about using the Talc Products.

141.    The Defendants breached the duty owed to Margie by failing to provide a warning to Margie of the risk of harm in using the Talc Products.

29

142.   The Defendants' breach of their duty to warn was the proximate cause of the injuries suffered by Margie.

143.   The injuries suffered by Margie constitute a disease, and they arose out of conduct by the Defendants which manifests a willful, reckless, or wanton disregard for life.

### COUNT V
### NEGLIGENT DESIGN AND MANUFACTURE AGAINST ALL DEFENDANTS

144.   Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

145.   The Talc Products used by Margie were manufactured in whole or in part by each Defendant, directly or indirectly.

146.   The Defendants knew or should have known that talc, when used in a woman's perineal region over a prolonged period of time, significantly increases the risk of developing ovarian cancer.

147.   Because the Defendants knew or reasonably should have known of the increased risk of developing ovarian cancer from perineal use of talcum powder, they had a duty to test, design, manufacture, distribute and sell the Talc Products in a reasonably safe condition for consumers, including Margie.

148.   Cornstarch is an organic carbohydrate which can be used by humans with no adverse health effects and has almost the same effectiveness as talcum powder.  At all times material hereto, the Defendants knew that cornstarch was a safe and feasible alternative to the talcum powder used in the Talc Products.

149.   The Defendants breached the duties they owed to Plaintiff by, *inter alia*:

a)   failing to adequately test the Talc Products to determine the safety of the products for their foreseeable and intended use, including testing for contaminants and other materials that increased risk of ovarian cancer from perineal use of the products;

b)   failing to design the Talc Products with cornstarch as an alternative ingredient to talcum powder;

c)   failing to manufacture the Talc Products with cornstarch as an alternative ingredient to talcum powder;

d)   failing to distribute the Talc Products with cornstarch as an alternative ingredient to talcum powder;

e)   failing to sell the Talc Products with cornstarch as an alternative ingredient to talcum powder; and/or

f)   otherwise failing to engage in conduct to ensure the reasonably safe use of the Talc Products.

150.   The Defendants' breaches of their duty to test, design, manufacture, distribute and sell the Talc Products in a reasonably safe condition for consumers was the proximate cause of the injuries suffered by Margie, including the disease of ovarian cancer.

151.   The injuries suffered by Margie constitute a disease, and they arose out of conduct by the J&J Defendants which manifests a willful, reckless, or wanton disregard for life.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS**

152.   Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

153.   The Defendants, in the course of an activity which was in furtherance of their own interests, undertook to give information to consumers of the Talc Products, including Margie, and

31

knew or should have realized, that the safety of those consumers may depend upon the accuracy of the information that was provided.

154. At times material hereto when Margie used the Talc Products, the Defendants knew or reasonably should have known of the increased risk of developing ovarian cancer from perineal use of the Talc Products, but failed to warn consumers, including Margie, of that risk.

155. On the contrary, the Defendants continually labeled, advertised and marketed the Talc Products as safe, when used as directed and expected, which included perineal use by women.

156. The Defendants failed to use reasonable care in supplying information to consumers of the Talc Products, including Margie, by:

   a) falsely stating in advertising, marketing, labeling and otherwise that the Talc Products were safe when used as directed, and in a reasonably foreseeable manner, which included perineal use; and

   b) omitting from its advertising, marketing, labeling and otherwise, statements regarding the increased risk of developing ovarian cancer from perineal use of the Talc Products.

157. Margie reasonably relied upon the aforesaid false or inaccurate information from the Defendants, which resulted in her purchase and/or use of the Talc Products in the perineal area over a prolonged period of time.

158. The reliance of Margie upon the Defendants' misrepresentations and omissions was reasonable and justified because, among other things, the misrepresentations and omissions were made by entities in a position to know the material facts, including safety information, about the Talc Products, while Margie was not in a position to know those facts, and did not know them.

159.   If Margie had been supplied with truthful information by the Defendants regarding the increased risk of developing ovarian cancer from using the Talc Products in the perineal area, she would not have used the Talc Products.

## COUNT VII
## FRAUD, MISREPRESENTATION AND CONCEALMENT BASED ON OCGA § 51-6-2 AGAINST ALL DEFENDANTS

160.   Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

161.   At all times material hereto, the safety of prolonged, perineal use of the Talcum Products was a material fact.

162.   The Defendants knew that perineal use of talcum powder, including the talcum powder contained in the Talc Products, was not safe because it increases the risk of ovarian cancer and committed one or more of the following acts, including but not limited to:

a)   Defendants falsely misrepresented to consumers, including Margie, in advertising, marketing, labeling and otherwise, that the Talc Products were safe when used as directed and in a reasonably foreseeable manner, which included perineal use;

b)   Defendants falsely misrepresented to consumers, including Margie, in advertising, marketing, labeling and otherwise, that the Talc Products were asbestos free;

c)   Defendants concealed the fact that internal documents showed asbestos was present in the Talc Products over the course of decades;

d)   Defendants concealed that significant epidemiology studies and other regulatory authorities concluded perineal use of the Talc Products was associated with an increased risk of ovarian cancer;

33

e) Defendants concealed the fact that the MSDS accompanying the shipment of talc used for the Talc Products warned that perineal use of talc-based body powders is possibly carcinogenic to humans; and

f) Alternatively, the Defendants recklessly represented that perineal use of the Talc Products was safe when it was not.

163.    The Defendants had a continuing duty to inform consumers, including Margie, that prolonged, perineal use of the Talc Products increases the risk of ovarian cancer.

164.    The aforesaid conduct was undertaken to induce consumers, including Margie, to act; *i.e.*, to use and continue using Talc Products for feminine hygiene purposes.

165.    Margie acted upon the Defendants' conduct by using and continuing to use Talc Products for a prolonged period of time in the perineal area.

166.    Margie could not have discovered the truth about the safety of the Talc Products in the exercise of due diligence.  If the truth had been disclosed to Margie, *i.e.,* that the Talc Products were not safe for perineal use, she would not have purchased, used or continued to use them.

167.    Because the Defendants committed fraud, which deterred Margie from bringing this action, the statute of limitations did not begin to run until the time she discovered the fraud, which occurred after her diagnosis of ovarian cancer.

## COUNT VIII
## FRAUD BY ACTS OR SILENCE BASED ON OCGA § 51-6-4 AGAINST ALL DEFENDANTS

168.    Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

169.    At all times material hereto, the safety of prolonged, perineal use of the Talcum Products was a material fact.

170.     The Defendants knew that perineal use of talcum powder, including the talcum powder contained in the Talc Products, was not safe because it increases the risk of ovarian cancer.

171.     Because of the role of the Defendants in supplying the Talc Products to consumers, including Margie, they had a duty to act or speak to inform customers of the Talc Products that perineal use of the Talc Products increases the risk of developing ovarian cancer.

172.     The Defendants breached this duty by intentionally and fraudulently failing to act or speak to provide truthful information to customers, including Margie, of the aforesaid risk.

173.     With intent to deceive and mislead consumers, including Margie, the Defendants willfully remained silent in its advertising, marketing, labeling and otherwise, with respect to the fact that the Talc Products were not safe when used as directed, and in a reasonably foreseeable manner, which included perineal use, because such use increases the risk of ovarian cancer.

174.     With intent to deceive and mislead consumers, including Margie, the Defendants willfully engaged in acts to prevent consumers from learning that perineal use of the Talc Products increases the risk of ovarian cancer. These acts included, but were not limited to, the J&J and Imerys Defendants being primary actors and contributors to the TIPTF.  Their involvement and actions with respect to the TIPTF were for the purpose of deceiving and misleading consumers, including Margie, regarding perineal use of talc increasing the risk of ovarian cancer.

175.     The J&J Defendants and PTI, willfully engaged in acts to prevent consumers from learning that perineal use of the Talc Products increases the risk of ovarian cancer because they knew of the efforts and actions with respect to the TIPTF and knew that the MSDS conveyed health and warning information about the carcinogenic nature of talc and remained silent for the purpose of deceiving and misleading consumers, including Plaintiff, regarding perineal use of talc increasing the risk of ovarian cancer.

35

176.    The aforesaid concealment and acts by the Defendants were to induce consumers, including Margie, to act, by using the Talc Products.

177.    Margie was deceived and misled by the Defendants and acted upon their willful concealment by using the Talc Products for a prolonged period of time.

178.    Margie could not have discovered the truth about the safety of the Talc Products in the exercise of due diligence.  If the truth had been disclosed to Margie, *i.e.,* that the Talc Products were not safe for perineal use, she would not have purchased or used them.

179.    Because the Defendants committed fraud, which deterred Margie from bringing this action, the statute of limitations did not begin to run until the time Margie discovered the fraud, which occurred after her diagnosis of ovarian cancer.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL HARM AGAINST ALL DEFENDANTS

180.    Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

181.    The Defendants knew that perineal use of talcum powder, including the talcum powder contained in the Talc Products, was not safe because it increases the risk of ovarian cancer.

182.    The Defendants falsely stated to consumers, including Margie, in its advertising, marketing, labeling and otherwise, that the Talc Products were safe when used as directed, and in a reasonably foreseeable manner, which included perineal use.

183.    The Defendants willfully misrepresented to consumers, including Margie, the safety of the Talc Products for perineal use.

184.    The aforesaid misrepresentation was made to induce consumers, including Margie, to act so the Defendants could maintain and increase their profits.

36

185.    Margie acted upon the misrepresentation of the Defendants by purchasing the Talc Products and using them for a prolonged period of time.  As a result of such use, her risk increased, and she ultimately developed ovarian cancer and suffered severe emotional distress.

186.    If the truth had been disclosed to Margie, *i.e.,* that the Talc Products were not safe for perineal use, she would not have used them.

187.    The conduct of the Defendants was intentional or reckless and was extreme and outrageous.  It went beyond all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.

188.    There is a causal connection between the wrongful conduct of the Defendants and the severe emotional distress suffered by Margie.

## COUNT X
## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

189.    Plaintiff incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

190.    At all times material hereto, to enhance their profits, the Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, acted in concert, aided and abetted and/or conspired  to cause the injuries suffered by Margie by exposing her to carcinogenic Talc Products, which are harmful and dangerous because perineal use of the Talc Products, which is an expected and intended use, increases the risk of ovarian cancer.

191.    Further, at all times material hereto, to enhance their profits, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to deceive and defraud consumers of the Talc Products, including Margie, regarding the true nature of the Talc Products and the increased risk of ovarian cancer from perineal use of the Talc Products.

192.    At all times material hereto, the Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to deceive and defraud consumers of the Talc Products, including Margie, to maintaining the popularity and reputation of the Talc Products and, thereby maintaining high sales of the Talc Products for their own profit and benefit, at the expense of consumer safety. During the mining, manufacturing and testing processes, Defendants intentionally developed and used less-sensitive methods designed not to detect the presence of asbestos and other contaminants, so they could falsely represent and report the Talc Products were "asbestos-free."

193.    In 2000, when scientists with the National Toxicology Program (NTP) voted to list perineal use of talc as a possible human carcinogen, the NTP was persuaded to defer an official decision on the status of talc. Richard Zazenski, a Luzenac executive, wrote a colleague afterwards stating "We, the talc industry dodged a bullet in December, based entirely over the confusion of the definition issue." Mr. Zazenski discussed an upcoming NTP review saying: "Time to come up with more confusion!"

194.    Pursuant to and in furtherance of said conspiracy, the Defendants performed the following overt and unlawful acts, *inter alia,* with a common and unlawful design:

a)  For many years, upon information and belief, the Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, talc based body powder, including the Talc Products, are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly;

b) Upon information and belief, despite the medical and scientific data, literature and test reports possessed by and available to the Defendants, they individually, jointly and in concert with each other, conspired with each other to fraudulently, willfully and maliciously:

    i.   Withhold, conceal and suppress said medical information regarding the increased risk of ovarian cancer from perineal use from consumers, including Margie;

    ii.   Through their direct involvement in, or knowledge of, the TIPTF, the Defendants instituted and adhered to a "defense strategy" to defend talc-based body powder at all costs, despite the disease and death it would cause women. The J&J Defendants and Imerys Talc, through the TIPTF, used their influence over the NTP Subcommittee, and the threat of litigation against the NTP, to prevent the NTP from classifying talc as a carcinogen on its 10th RoC (Report of Carcinogens);

    iii.   The J&J Defendants and Imerys Talc, through the TIPTF, used their influence over local, state and federal agencies to control material facts disclosed to consumers, including Margie; and

    iv.   The J&J Defendants and Imerys Talc, caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer, which Defendants knew were incorrect, incomplete and misleading.

195. Upon information and belief, by these deceptive, false and fraudulent representations, omissions and concealments, the Defendants intended to induce consumers,

39

including Margie, to rely upon these deceptive, false and fraudulent representations, omissions and concealments, and to continue to expose herself to the dangers inherent in the use of talc-based body powders and, specifically, the Talc Products. Margie reasonably relied upon the aforementioned deceptive, fraudulent representations, omissions and concealments made by the Defendants regarding the nature of talc-based body powder and, specifically, the Talc Products.

196.    If Margie had been supplied with truthful information by the Defendants regarding the danger of using the Talc Products in the perineal area, she would not have purchased or used them.

197.    At all times material hereto, the Defendants also entered into a joint enterprise with each other because they combined their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, but the arrangement did not establish a partnership.  In doing the acts alleged herein, the Defendants were acting in the course and scope of such joint enterprise. Accordingly, the Defendants are jointly liable for the conspiracy and wrongful acts of each other.

**COUNT XI**
**CLAIM FOR PUNITIVE DAMAGES BASED ON O.C.G.A. § 51–12–5.1 AGAINST ALL DEFENDANTS**

198.    Plaintiff hereby incorporates the allegations set forth in previous paragraphs of this Complaint as if fully set forth herein.

199.    The conduct of each Defendant was unprincipled and unconscionable.   Their conduct showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which raises the presumption of conscious indifference to the consequences.

200.    Accordingly, Plaintiff seeks an award of punitive damages against each Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(a)   A judgment against each defendant in an amount sufficient to fully and fairly compensate for the physical, psychological, emotional injuries, current, past and future medical bills, and the general and special damages sustained;

(b)  A judgment against all defendants for punitive damages in such amounts as to punish, penalize and deter them from such conduct, and to deter other similarly situated companies;

(d)  A judgment against all defendants for attorneys' fees pursuant to O.C.G.A. §13–6–11;

(e)  A judgment for costs against all defendants; and

(f) Such further relief as may be just, proper, and reasonable under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 24th day of October, 2018.

**CHEELEY LAW GROUP, LLC**

/s Robert D. Cheeley
Robert D. Cheeley
Georgia Bar No.122727
Julia A. Merritt
Georgia Bar No. 159038

299 South Main Street, Suite A
Alpharetta, GA  30009
Phone: (770) 559-6365
bob@cheeleylawgroup.com
julia@cheeleylawgroup.com

**BARNES LAW GROUP, LLC**

/s Roy E. Barnes
Roy E. Barnes
Georgia Bar No.039000
John R. Bevis
Georgia Bar No. 056110
Benjamin R. Rosichan
Georgia Bar No. 296256

31 Atlanta Street
Marietta, GA  30060
Phone: (770) 227-6375
roy@barneslawgroup.com
bevis@barneslawgroup.com
brosichan@barneslawgroup.com

*Attorneys for Plaintiff*

# EXHIBIT A

STATE OF SOUTH CAROLINA
COUNTY OF ORANGEBURG

## AFFIDAVIT OF CHARVETTE EVANS MONROE

I, CHARVETTE EVANS MONROE, being first duly sworn on oath, depose

and state that I am over 18 years of age and have personal knowledge of the facts

set forth in this Affidavit and, provide the information required by O.C.G.A. § 51-

14-7 as follows:

**(1) The exposed person's name, address, date of birth, social security number, and marital status;**

| | |
|---|---|
| Exposed Person's Name: | Marie Gunby Evans |
| Address: | 2117 Clairmont Drive, Augusta, GA 30904 |
| Date of Birth: | July 27, 1940 |
| Date of Death: | March 12, 2018 |
| Social Security Number: | xxx-xx-8931 |
| Marital Status: | Widow |

**(2) If the exposed person alleges exposure to asbestos or silica through the testimony of another person or other than by direct or bystander exposure to a product or products, the name, address, date of birth, social security number, and marital status for each person by which claimant alleges exposure, hereafter the "index person," and the claimant's relationship to each such person;**

1

**Index Person #1:**      Charvette Evans Monroe, DMD
    Address:          129 Nicoles Way, Grovetown, GA 30813
    DOB:             11/3/1967
    SSN:             xxx-xx-9378
    Marital Status:   Married
    Relation:        Daughter

**Index Person #2:**      Patrice Yvonne Evans
    Address:          705 Town Blvd. # 401
                     Brookhaven, GA 30319
    DOB:             11/25/1972
    SSN:             xxx-xx-7688
    Marital Status:   Single
    Relation:        Daughter

*** Claimant may supplement this information as additional Index Persons are identified with relevant information.

**(3) The specific location of each alleged exposure;**

Claimant was exposed to asbestos from her regular use of Johnson & Johnson's Baby Powder from 1952 to 2008 in Richmond County, Georgia. During that time period, Claimant resided at the following addresses, where the exposure occurred:

    1952 – 1966:  1115 Seventh Avenue, Augusta, GA 30901
    1966 – 1968:  Unknown apartment in Augusta
    1968 – 1974:  2708 Hazel Street, Augusta, GA 30901
    1974 – 2018:  2117 Clairmont Drive, Augusta, GA 30904

**(4) The specific asbestos-containing product or silica-containing product to which the exposed person was exposed and the manufacturer of each product;**

Johnson & Johnson's Baby Powder manufactured by one or more of the Defendants named in this action.

2

**(5) The beginning and ending dates of each alleged exposure as to each asbestos-containing product or silica-containing product for each location at which exposure allegedly took place for plaintiff and for each index person;**

Beginning dates of exposure (each instance):         Daily exposure began in 1952

Ending dates of exposure (each instance):          Daily exposure ended in 2008

**(6) The occupation and name of employer of the exposed person at the time of each alleged exposure;**

Occupation at each time of exposure:          Elementary School Teacher

Employer at each time of exposure:          Richmond County
                                                     School System

**(7) The specific condition related to asbestos or silica claimed to exist;**

Ovarian Cancer

**(8) Any supporting documentation of the condition claimed to exist**

See pathology report, attached.

**9) The identity of any bankruptcy trust to which a claim has been submitted concerning any asbestos or silica injury of the exposed person, attaching any claim form or other information submitted to such trust or trusts with respect to the exposed person. Plaintiff must also identify any bankruptcy trust that the plaintiff believes is or may be liable for all or part of the injury at issue, even if a claim has not been submitted to that trust at the time the complaint is filed.**

None known at this time.

3

Further Affiant Sayeth Not.

_____
Charvette E. Monroe as Executor
of the Estate of Margie G. Evans

Sworn to and subscribed before me
This __23rd__ day of October, 2018.

_____
Notary Public,
My commission expires: _10-17-2024_

4

# EXHIBIT B

 **MASSACHUSETTS GENERAL HOSPITAL**

 **HARVARD MEDICAL SCHOOL**

Pulmonary and Critical Care Unit and
The Department of Pathology
55 Fruit Street, Warren 253
Boston, Massachusetts 02114-2696

Telephone: 617-726-8491 or 617-726-1721
Fax: 617-726-9029

Richard Kradin, M.D.
*Director of Pulmonary Immunology
and Molecular Biology*

*Pulmonary Pathologist*

## MEDICAL REPORT

October 21, 2018

Jennifer Secrist
Senior Paralegal
Cheely Law Group
299 S. Main Street
Alphareta, GA 30009

**RE:    MARGIE G. EVANS, DECEASED**

Dear Ms. Secrist:

**Materials Reviewed:** I have completed my review of the following materials: A supplied memo of medical history and exposure, 16 slides labeled SP16-11229 (8) and SP-17-157 (8); an autopsy report by Dr. G. Gowitt (3-13-18); a report by Dr. V. Roggli (05-18-2018), the report of Dr. C. Jameson (10-15-2018), the reports from REI Environmental, Inc. (RES 403487-1 & 2) dated 10-11-2018; and the requirements contained in O.C.G.A § 51-14-1 et. seq.

**Medical History:** In October of 2016, Mrs. Evans was a 75-year-old woman (G2P2) who presented to Augusta University Health with "shingles," diarrhea, abdominal pain, and a 30-lb weight loss over several months.  Her past medical history was non-contributory.

CT scans of the abdomen revealed a 7.2 cm complex cystic mass of the right ovary with mesenteric implants. CA-125 serology was markedly elevated.

She underwent exploratory laparotomy with biopsies and infra-colic omentectomy which showed a right ovarian carcinoma with extensive serosal and mesenteric implants.

BRACA blood analysis was negative.

She was treated with combination chemotherapy and subsequently with total abdominal hysterectomy and salpingo-oophorectomy with debulking.

She subsequently received additional chemo therapy but died in March of 2018. The cause of death was listed as "Complications of ovarian cancer."

**Pathology Review:** My review of the tissue sections confirms that Mrs. Evans had a high-grade papillary serous carcinoma, a primary cancer, of the ovary with serosal and mesenteric tumor implants. The sections reveal a tubulo-papillary carcinoma with psammoma bodies typical of serous carcinoma with lymphatic channel invasion.

— 2 —

Immunostains demonstrated tumor cell immunopositivity for PAX-8, AE1/AE3 pan-cytokeratins, Cam 5.2, BerEp4, B72.3, CK5/6 (focally), WT-1, and D2-40, confirming the diagnosis.

**Exposure History:** Mrs. Evans was an Elementary School Teacher from 1965 until 1997 and was unaware of potential exposures to asbestos.

Mrs. Evans was a regular user of Johnson & Johnson Baby Powder, a cosmetic talcum powder product. She lived with her grandmother who applied Johnson & Johnson Baby Powder to her person when she was a child. Beginning in 1952 and continuing until 2008, she routinely applied talcum powder to her body under dusty conditions.

**Ancillary Findings:** Johnson & Johnson Baby Powder has been demonstrated to be contaminated by asbestiform anthophyllite and tremolite amphibole. (see references)

The laboratory testing of containers of Johnson & Johnson Baby Powder by REI Environmental in this case identified amphibole asbestos (anthophyllite) contamination, confirmed by transmission electron microscopy and energy-dispersive spectroscopy with selected area electron diffraction.

Dr. Roggli identified asbestiform anthophyllite fibers in the digestate of a peritoneal lymph node by scanning electron microscopy with energy dispersive x-ray analysis (EDAX) from the autopsy of Mrs. Evans, indicating previous asbestos exposure, and consistent with the contamination of Johnson & Johnson Baby talcum powder as noted above.

**Background:** Cosmetic talcum powders have been demonstrated to contain asbestos. In 1974, Rohl and Langer showed that 10 of 20 talc products, including baby powders, facial talcums and a pharmaceutical contained both tremolite and anthophyllite asbestiform fibers (Rohl AN, Langer A. *Identification and Quantitation of Asbestos in Talc.* Enviro Health Persp 1974:9;5-109.)

Privately conducted analytical studies by S. Compton have shown asbestos contamination of some samples of Italian and Vermont commercial talcum powder.

Gordon *et al* tested talcum powder and the lung tissue of a woman who had used talcum powder and identified amphibole asbestos fibers. These were confirmed to be anthophyllite and tremolite by electron dispersive spectrometry (EDS) and selected-area electron diffraction (SAED). (Gordon RE, Fitzgerald S, Millette J. *Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women.* Int J Occup Environ Health. 2014 Oct;20(4):318-32).

The WHO IARC Working Group 100C Monograph <u>Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite)</u> concluded that there is a causal association between exposure to asbestos and cancer of the ovary, based on five strongly positive cohort mortality studies of women with heavy occupational exposure to asbestos (Acheson *et al.*, 1982; Wignall & Fox, 1982; Germani *et al.*, 1999; Berry *et al.*, 2000; Magnani *et al.*, 2008). Their conclusion received additional support from studies showing that women and girls with environmental, but not occupational exposure to asbestos (Ferrante *et al.*, 2007; Reid *et al.*, 2008, 2009) had positive increases in both ovarian cancer incidence and mortality.

Richard L. Kradin, M.D., D.T.M.&H.

— 3 —

Several epidemiological studies have demonstrated an increased incidence of ovarian carcinoma in subjects exposed to cosmetic talc via perineal application. These studies are discussed in detail in the report issued by Jameson in this case.

**Conclusions:** Mrs. Evans was diagnosed and died from complications of advanced ovarian carcinoma. It is my conclusion to a reasonable degree of medical probability that her cumulative exposure to Johnson & Johnson Baby Powder, a cosmetic talcum powder contaminated with asbestos, with appropriate latency ($\geq$10 years), was a substantial contributory factor to the cause of the ovarian carcinoma that caused her death. Additionally, based on information available at this time, and review of Mrs. Evans' historical background provided to me, there are no other known exposures that would have been the sole or most likely cause of the ovarian carcinoma that caused her death.

I retain the right to modify this report if additional information becomes available prior to giving sworn testimony in this case.

If I can be of further assistance in this case, please let me know.


Sincerely yours,

# Richard Kradin, M.D. (signed electronically)
Richard Kradin, M.D.
RK: la




Richard L. Kradin, M.D., D.T.M.&H.

— 4 —

## BIBLIOGRAPHY FOR TALC ASBESTOS EXPOSURE

Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. *Fibrous and Mineral Content of Cosmetic Talcum Products*. Am Indus Hyg Assoc Journal 1968 July/August pp 350 -354.

Rohl AN. *Asbestos in Talc*. Enviro Health Persp 1974 Vol 9 pp 129-132.

Rohl AN, Langer A. *Identification and Quantitation of Asbestos in Talc*. Enviro Health Persp 1974:9;5-109.

*Asbestos Found in Ten Powders*. New York Times March 10, 1976.

Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R. *Consumer Talcums and Powders: Mineral and Chemical Characterization*. Journal of Tox and Enviro Health 1976 2:255-284.

Gordon RE, Fitzgerald S, Millette J. *Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women*. Int J Occup Environ Health. 2014 Oct;20(4):318-32.

Longo DK, Young RS. *Cosmetic Talc and Ovarian Cancer*. Lancet. 1979 Aug 18;2(8138):349-51.

Cramer DW, Welch WR, Scully RE, Wojciechowski CA. *Ovarian Cancer and Talc* 1982 Cancer 50: 372-376.

Paoletti L, Caiazza S, Donelli G, Pocchiari F. *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial. Cosmetic and Pharmaceutical Talcs* Regulatory Toxicology and Pharm 1984 4 222-235.

Andrion A, Bosia S, Paoletti L, Feyles E, Lanfranco C, Bellis D, Mollo F. *Malignant Peritoneal Mesothelioma in a 17-year old boy with evidence of previous exposure to Chrysotile and Tremolite Asbestos*. Hum Pathol. 1994 Jun;25(6):617-22.

Srebo S, Roggli V. *Asbestos-Related Disease Associated with Exposure to Asbestiform Tremolite*. Am J Int Med 1994 26:809-819.

Srebo S, Roggli V, Samsa G. *Malignant Mesothelioma Associated with Low Pulmonary Tissue Asbestos Burdens: A Light and Scanning Electron Microscopic Analysis of 18 Cases*. Mod Pathol. 1995 Aug;8(6):614-21.

Heller D, Gordon R, Westhoff C, Gerber S. *Asbestos Exposure and Ovarian Fiber Burden*. Am J Industrial Med 1996 29: 435-439.

Scancarello G, Romero R. *Respiratory Disease as a Result of Talc Inhalation*. J Occup Environ Med 1996 June;38(6):610-4.

Hull M, Abraham J. Case B *Mesothelioma among Workers in Asbestiform Fiber-bearing Talc Mines in New York State*. Am Occup Hyg 2002 Vol 46 Supplement 1 pp 132-135.

Richard L. Kradin, M.D., D.T.M.&H.

— 5 —

Coggiola M, Bosio D. *An Update of a Mortality Study of Talc Miners and Millers in Italy*. Am J Ind Med 2003 44:63-69.

Mirabelli, D. *Letter on Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence review of the epidemiology*. Inhalation Toxicology. 29:341.

*IARC on Talc* 2010.

Price B. *Industrial-Grade Talc Exposure and the Risk of Mesothelioma*. Crit Rev Toxicol 2010 Jul;40(6)513-30.

Finkelstein M. *Malignant Mesothelioma Incidence Among Talc Miners and Millers in New York State*. Am J Ind Med 2012 55:863-868.

Finkelstein M. *Pneumoconiosis and Malignant Mesothelioma in a Family Operated Metal Casting Business That Used Talc from New York State*. Am J Ind Med 2013 56:550-555.

Compton, S. *Report of Results MVA11730: Investigation of Italian Talc Samples*. MVA Scientific Consultants. August 2017.

Mattenklott et al. Asbestos in Talc and Soapstone. 2007. Springer-Verlag. pp. 267-291.

Roggli, V. et al. *Tremolite and Mesothelioma*. Ann Occup. Hyg.2002. 5:447-453.

US EPA, *Response to November 2005 National Stone, Sand, and Gravel Inc. Report Prepared by R.J. Lee Group*. April 20, 2006.

Compton, S. *Examination of Pinaud Clubman Talc for Asbestos. MVA Report: 12113*. September 20, 2017.

The references cited in this report are not all inclusive. If necessary, this report may be supplemented with additional references that may be pertinent to the case-specific issues.

Richard L. Kradin, M.D., D.T.M.&H.

COUNTY OF SUFFOLK
STATE OF MASSACHUSETTS

### AFFIDAVIT OF RICHARD L. KRADIN, M.D.

PERSONALLY APPEARED before the undersigned, an officer duly authorized to administer oaths, RICHARD L. KRADIN, M.D., who, upon oath, deposes and says:

1.

My name is Richard L. Kradin, and I am more than 18 years of age, of sound mind and suffer no legal impairment or disability. I am competent to testify as to the matters set forth herein and do so based on my personal knowledge, education, training and experience. I give this affidavit pursuant to the provisions of O.C.G.A. § 51-14-1 et. seq. for the purposes of establishing prima-facie evidence of physical impairment and in support of the asbestos claims of Margie G. Evans.

2.

I am a pulmonologist and pathologist licensed to practice in Massachusetts. I have specialized in pulmonary disease for almost 40 years. I am board certified in Internal Medicine, Anatomic Pathology, and Pulmonary Medicine. My areas of sub-specialization include pulmonary pathology and autopsy pathology.

[1]

3.

I am an Associate Physician and Associate Pathologist at Massachusetts General Hospital, and an Associate Professor of Pathology and Associate Professor of Medicine at Harvard Medical School. I have an advanced degree in chemical physics and have studied epidemiology at the London School of Hygiene.

4.

Since the 1980s, I have had special interest in the clinical features of pathology and of asbestos-related diseases. I direct postgraduate work on asbestos-related diseases at Harvard Medical School and have been the Principal Investigator on several research projects, including one involving asbestosis. I am the Director of a yearly seminar on asbestos-related pulmonary disease and co-director of a yearly seminar on thoracic pathology, both through the Harvard Medical School. I routinely read the literature concerning fiber release from various asbestos containing products and the effects on the human body. I am also familiar with what has been published with regard to the level of asbestos present in the ambient air.

5.

In addition to research and teaching, I have personally cared for patients with both benign and malignant asbestos-related diseases, and have

[2]

frequently had the opportunity to review pathology specimens from patients with asbestos-related diseases at Massachusetts General Hospital, as well as cases sent to me from outside sources for my opinion based on my established expertise with the diagnoses of these disorders. I have personally reviewed hundreds of biopsies of asbestos-related malignancies and I have performed numerous autopsies in patients with asbestos-related diseases. My qualifications to render opinions in this case are more fully described in my Curriculum Vitae attached hereto.

6.

This affidavit is attached to a case-specific medical report (which is fully incorporated herein) and sets forth the medical findings necessary to establish prima-facie evidence of physical impairment of Margie G. Evans due to asbestos exposure.

7.

Mrs. Evans was diagnosed and died from complications of advanced ovarian carcinoma, which was a primary cancer. It is my conclusion to a reasonable degree of medical probability that her cumulative exposure to commercially available Johnson & Johnson Baby Powder, as cosmetic talcum powder contaminated with asbestos, with appropriate latency ($\geq 10$ years), was a substantial contributory factor to the cause of the ovarian

[3]

carcinoma that caused her death.   Additionally, based on the information available at this time, and review of Mrs. Evan's' historical background provided to me, there are no other known exposures that would have been the sole or most likely cause of the ovarian cancer that caused her death.


FURTHER AFFIANT SAYETH NOT


This __22__ day of ___October___, 2018.


_____
RICHARD L. KRADIN, M.D.


Sworn to and subscribed before me
This __22__ day of __October__, 2018.

My Commission Expires:

MAYERLING R. DADA
Notary Public
Commonwealth of Massachusetts
My Commission Expires
January 11, 2019

[4]

# CURRICULUM VITAE AND BIBLIOGRAPHY

## Part I: General Information

**DATE PREPARED:**     June 6, 2018

**NAME:**     Richard Lawrence Kradin

**OFFICE ADDRESS:**     Warren 253
Massachusetts General Hospital
Boston, MA 02114

**HOME ADDRESS:**     6 Whittier Place
Boston, MA 02114

**WORK E-MAIL:**     **rkradin@partners.org**

**PLACE OF BIRTH:**     New York City, New York

**EDUCATION:**

| | | |
|---|---|---|
| 9/67-6/1971 | B.A. | New York University (Honors in Chemistry) |
| 9/1971-6/1972 | M.S. | New York University (Chemical Physics) |
| 9/1972-6//1976 | M.D. | Thomas Jefferson University (Cum Laude) |
| 9/2006-6/2009 | M.L.A. | Harvard University (Summa Cum Laude) |
| 1/2010-4-2010 | D.T.M.&H | London School of Hygiene & Tropical Medicine |

## POSTDOCTORAL TRAINING:

### Internships and Residencies:

7/1976-6/1977  Intern in Medicine, The Pennsylvania Hospital
7/1977-6/1978  Resident in Medicine, The Pennsylvania Hospital
7/1978-6/1980  Resident in Pathology, Massachusetts General Hospital
7/1980-6/1981  Chief Resident in Pathology, Massachusetts General Hospital

### Research Fellowships:

7/1981-6/1983  Clinical and Research Fellow in Pulmonary Medicine
Massachusetts General Hospital
7/1981-6/1983  Research Fellow in Immunopathology
Massachusetts General Hospital

## LICENSURE AND CERTIFICATION:

| | |
|---|---|
| 1977 | National Board of Medical Examiners |
| 1979 | American Board of Internal Medicine |
| 1979 | Massachusetts License Registration |
| 1980 | Controlled Substances Registration |
| 1981 | American Board of Pathology, Certificate in Anatomic Pathology |
| 1985 | American Board of Internal Medicine, Certificate in Pulmonary Medicine |

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| 7/1972-6/1973 | Teaching Assistant in Chemistry, New York University |
| 7/1977-6/1978 | Assistant Clinical Instructor in Medicine, University of Pennsylvania |
| 7/1978-6/1981 | Clinical Fellow in Pathology, Harvard Medical School |
| 7/1981-6/1983 | Research Fellow in Pulmonary Medicine, Harvard Medical School |
| 7/1983-6/1986 | Instructor in Pathology, Harvard Medical School |
| 7/1986-6/1990 | Assistant Professor of Pathology, Harvard Medical School |
| 7/1990-current | Associate Professor of Pathology, Harvard Medical School |
| 4/2010-current | Adjunct Faculty, Pacifica University |
| 11/2011- | Associate Professor of Medicine, Harvard Medical School |

## HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 7/1982-6/1983 | Assistant in Pathology, Massachusetts General Hospital |
| 7/1983-6/1987 | Clinical Assistant in Medicine, Massachusetts General Hospital |
| 7/1986-6/1989 | Assistant Pathologist, Massachusetts General Hospital |
| 7/1987-6/1992 | Assistant in Medicine, Massachusetts General Hospital |
| 7/1987-6/1994 | Clinical Director, Cancer Immunotherapy, Massachusetts General Hospital |
| 7/2011-current | Clinical Director, MGH Dyspnea Clinic |
| 7/1990-current | Associate Pathologist |
| 7/1992-2009 | Assistant Physician, Massachusetts General Hospital |
| 6/2009-current | Associate Physician, Massachusetts General Hospital |
| 7-2013-current | Consultant Pathologist and Pulmonologist, Hadassah Hospital Jerusalem, IL |
| 5-2018-current | Pathologist, Massachusetts General Hospital |

## SERVICE ASSIGNMENTS:

| | | |
|---|---|---|
| 1983-current | Supervisor | Diagnostic Lung and Cardiac Pathology and Pulmonary Immunopathology Services, Massachusetts General Hospital |
| 1983-current | Supervisor | Autopsy Service, Massachusetts General Hospital |
| 1984-current | Staff | Pulmonary and Critical Care Unit, Massachusetts General Hospital |
| 1985-1990 | Director | MGH Cancer Adoptive Immunotherapy Program, Massachusetts General Hospital |
| 1990-current | Director, | Pulmonary Immunology and Molecular Biology, Massachusetts General Hospital |
| 1992-current | Immunopathologist | Lung Transplant Service, Massachusetts General Hospital |
| 2003-current | Director, Infectious | MGH Pathology Department |

2

|       | Disease Pathology |                                              |
|-------|-------------------|----------------------------------------------|
| 2010- | Staff             | MGH General Medical Service                  |
| 2010  | Staff             | Occupational and Environmental Health Clinic |

## MAJOR COMMITTEE ASSIGNMENTS:

<u>Hospital:</u>
7/1985-6/1992  MGH Subcommittee for the Review of Research Proposals

<u>National:</u>
7/1986          Ad Hoc NCI Contract Review Committee for LAK Cell and IL-2
7/1990-6/1993  NIH Experimental Therapeutic-2 Study Section

## PROFESSIONAL SOCIETIES:

| 1978-current | New England Pathology Society, member |
| 1980-current | American Thoracic Society, member |
| 1986-current | American Association of Immunologists, member |
| 1987-current | New England Cancer Society, member |
| 1988-current | American Association of Pathologists, member |
| 1988-current | Clinical Immunology Society, member |
| 1988-current | Psychosomatic Society, member |
| 1997-current | Psychoneuroimmunology Research Society, member |
| 2003-current | Dammon-Binford Infectious Disease Society,  member |

## EDITORIAL BOARDS:

| 1988-current | Section Editor: Pathology and Immunopathology Research |
| 1989-current | Editorial Panel: Human Pathology |
| 2013-current | Senior Editor: Pathology Discovery |
| 2015-current | Contributing Editor: American Journal of Industrial Medicine |
| 2015-current | Editor: EC Pulmonology and Respiratory Medicine |

## AWARDS AND HONORS:

| 1976 | Alpha Omega Alpha |
| 1976 | Arthur J. Krieger Prize for Excellence in Neurology |
| 1985 | Upjohn Company Award for Cancer Research |
| 1997 | Gradiva Award National Association for Advancement of Psychoanalysis |
| 2009 | Thomas Small Prize, Harvard University for Academic Achievement |

3

## Part II: Research, Teaching, and Clinical Contributions

### A. FUNDING INFORMATION:

| | | | |
|---|---|---|---|
| 1984-87 | National Institute of Health | R. Kradin | Coagulation and Lung Injury |
| 1988-95 | National Institute of Health | E. Schneeberger | Pulmonary Dendritic Cells |
| 1985-87 | Tobacco Council | J. Kurnick | Tumor Infiltrating Lymphocytes |
| 1986-89 | National Institute of Health | R. Kradin | TIL and IL-2 |
| 1987-90 | National Institute of Health | R. Kradin | Dendritic Cells and HIV |
| 1995-2001 | National Institute of Health | R. Kradin | Pulmonary Immunity |
| 2000-2003 | Center for Disease Control | R. Kradin Co-PI | Relaxation Response |
| 2004-2008 | National Institute of Health | N. Choi | Radiation and Lung Cancer |

### B. REPORT OF CURRENT RESEARCH:

Molecular abnormalities in malignant mesothelioma-Principal Investigator
Asbestos form fiber contamination of cosmetic talc- Principal Investigator
Lung pathologies in celiac disease- Principal Investigator

### D. REPORT OF TEACHING:

1.    **Graduate and Continuing Education Courses (Selected)**

| | |
|---|---|
| 1985- | Lecturer in Pulmonary Medicine, Harvard Post-Graduate Course<br>Post-graduate physicians (150) |
| 1985- | Lecturer in Pulmonary Pathology, Harvard Post-Graduate Course, MGH<br>Post-graduate physicians (250) |
| 1987 | Lecturer in Thoracic Oncology Harvard Post-Graduate Course, MGH<br>Post-graduate physicians (100) |
| 1987 | Lecturer in Thoracic Surgery Harvard Post-Graduate Course, MGH<br>Post-graduate physicians (150) |
| 1997 | Speaker, Medical Grand Rounds, MGH<br>Medical Staff (100) |
| 1998- | Invited Speaker, Psychiatry Grand Rounds, MGH<br>Medical staff (50) |
| 1999 | Invited Speaker, Pathology Grand Rounds, MGH<br>Medical Staff (50) |

4

| | |
|---|---|
| 2000 | Invited Speaker, Pulmonary Grand Rounds<br>Medical Staff (50) |
| 2001 | Invited Speaker, Pathology Grand Rounds<br>Medical Staff (50) |
| 2002 | Invited Speaker, Pathology Grand Rounds<br>Medical Staff (50) |
| 2003 | Invited Speaker, Pulmonary Grand Rounds<br>Medical Staff (50) |
| 2003 | Harvard Mind/Body Medicine Post Graduate Course<br>Director<br>Physicians and psychologists (250) |
| 2004 | Invited Speaker, Advanced Heart and Lung Disease<br>Medical Staff (50) |
| 2005-current | Director: Current Concepts in Asbestos-Related Lung Disease, Harvard Post-Graduate Course, MGH |
| 2005 | Invited Speaker: Current Concepts in Pulmonary Disease, Harvard Post-Graduate Course, MGH |
| 2006 | Current Concepts in Asbestos-Related Lung Disease<br>Caritas Samaritan Hospital |
| 2006-current | Invited Speaker: Current Concepts in Pulmonary Disease, Harvard Post-Graduate Course, MGH |
| 2007-current | Co-Director :Current Concepts in Thoracic Pathology, Harvard Post-Graduate Course, MGH. |

## 2. REGIONAL, NATIONAL OR INTERNATIONAL CONTRIBUTIONS

### Selected Invited Presentations:

| | |
|---|---|
| 1986 | Lecturer, Board of Councilors, National Cancer Institute |
| 1986 | Lecturer, Hammer Conference on Cancer Immunotherapy, Salk Institute |
| 1986 | Lecturer, FASEB Summer Conference on Immunopharmacology |
| 1987 | Lecturer, Hammer Conference, Salk Institute |
| 1987 | Lecturer, University of Michigan Cancer Center Conference on Biological Modifiers |
| 1987 | Lecturer, Invited Panelist, American Thoracic Society |
| 1987 | Lecturer, Board of Councilors, National Cancer Institute |
| 1988 | Lecturer, Hammer Conference, Salk Institute |
| 1988 | Lecturer, New England Cancer Society |
| 1989 | Lecturer, Hammer Conference, Salk Institute |
| 1990 | Guest Lecturer, NCI, BRMP Branch |
| 1990 | Lecturer, Guest Lecturer, University Western Australia |

5

| 1993 | Lecturer, Chair, Plenary Session, American Thoracic Society |
|------|------------------------------------------------------------|
| 1994 | Lecturer, Plenary Session, Lung Immunology, American Thoracic Society |
| 1995 | Lecturer, Plenary Session, Lung Immunology, American Thoracic Society |
| 1996 | Lecturer, Plenary Session, Lung Immunology, American Thoracic Society |
| 1996 | Lecturer, Plenary Session, Pediatric Lung Pathology, American Thoracic Society |
| 1997 | Lecturer, Plenary Session, Lung Immunology, American Thoracic Society |
| 1998 | Lecturer, Post Graduate Course in Pulmonary Immunology, American Thoracic Society |
| 1998 | Chair, Plenary Session, American Thoracic Society |
| 1999 | Chair, Plenary Session, American Thoracic Society |
| 2000 | Lecturer, Plenary Session, International Academy of Pathology |
| 2001 | Chair, Plenary Session, American Thoracic Society |
| 2002 | Chair, Plenary Session, American Thoracic Society |
| 2002 | Chair, Plenary Session, Psychoneuroimmunology Research Society |
| 2003 | Lecturer, Post Graduate Course in Pulmonary Immunology, American Thoracic Society |
| 2004 | Lecturer, Dyspnea, American Thoracic Society |
| 2005 | Lecturer, New England Path Society "Emerging Infections" |
| 2006 | Lecturer, U.S. Canadian Academy of Pathology |
| 2007 | Lecturer, American Thoracic Society |
| 2008- | Lecturer, American Thoracic Society |
| 2009 | Lecturer, American Thoracic Society |

6

## Part III: BIBLIOGRAPHY:

### Original Articles:

1.  Duckett S, Cracco J, Graziani L, Scot TG, Solomon D, **Kradin, R**: Inclusions in the sural nerve in metachromatic leukodystrophy.  Acta Neuro Lat-Am  1975;21(1-4):184-193.

2.  Duckett S, Galle P, **Kradin R**:  The relationship between Parkinson's syndrome and vascular siderosis: an electron microprobe study.  Ann Neurol  1977;2(3):225-229.

3.  **Kradin RL**, Kiprov D, Dickersin GR, Collins AB, Kradin L, Mark EJ:  Immune complex disease with fatal pulmonary hemorrhage; Its occurrence in a patient with myasthenia gravis.  Arch Pathol Lab Med  1981;105(11):582-585.

4.  **Kradin RL**, Young RH, Kradin LA, Mark EJ:  Immunoblastic lymphoma arising in chronic lymphoid hyperplasia of the pulmonary interstitium.  Cancer  1982;50(7):1339-1343.

5.  **Kradin RL**, Young RH, Dickersin GR, Kirkham SE, Mark EJ:  Pulmonary blastoma with argyrophil cells and lacking sarcomatous features (pulmonary endodermal tumor resembling fetal lung).  Am J Surg Pathol 1982;6(2):165-172.

6.  **Kradin RL**, Mark EJ:  Benign lymphoid disorders of the lung, with a theory regarding their development.  Hum Pathol  1983;14(10):857-867.

7.  Zhu YJ, **Kradin R**, Brandstetter RD, Staton G, Moss J, Hales CA: Hypoxic pulmonary hypertension in the mast cell-deficient mouse.  J Appl Physiol  1983;54(3):680-686.

8.  Colvin RB, **Kradin RL**.  Are the biologic activities of fibronectin controlled by alterations in its molecular form?  Surv Synth Path Res.  1983;2:10-20.

9.  Colvin RB, Clark RAF, Dvorak HF, Gardner PI, Hammond ME, **Kradin RL**, Lanigan JM, Mosesson MW, Roblin RO, Verderber EL:  Fibrinogen-fibrin interaction with fibroblasts and macrophages.  NY Acad Sci  1983;408:621-633.

10.  Hales CA, **Kradin RL**, Bransetter RD, Zhu YJ.  Impairment of hypoxic pulmonary artery remodeling by heparin in mice.  Am Rev Respir Dis  1983;128(4):747-751.

11.  Amento EP, Bhalla AK, Kurnick JT, **Kradin RL**, Clemens TL, Holick SA, Holick MF, Krane SM: 1 alpha, 25-dihydroxyvitamins D3 induces maturation of the human monocyte cell line U937, and, in association with a factor from human T lymphocytes, augments production of the monokine, mononuclear cell factor.  J Clin Invest  1984;73(3):731-739.

12.  Zapol WM, Wilson R, Hales C, Fish D, Castorena G, Hilgenberg A, Quinn D, **Kradin** R: Venovenous bypass with a membrane lung to support bilateral lung lavage.  JAMA 1984;251(24):3269-3271.

13.  **Kradin RL**, Spirn PW, Mark EJ:  Intrapulmonary lymph nodes.  Clinical, radiologic, and pathologic features.  Chest  1985;87(5):662-667.

14.  **Kradin RL**, Divertie MB, Colvin RB, Ramirez J, Ryu J, Carpenter HA, Bhan AK: Usual interstitial pneumonitis is a T-cell alveolitis.  Clin Immunol Immunopath  1986;40(2):224-235.

15. **Kradin RL,** Kurnick JT, Amento EP, Colvin RB: Leu-M2 (Mac-120) is a platelet antigen and is not constitutively expressed by macrophages. Clin Immunol Immunopath 1986;39(3):442-451.

16. Kurnick JT, **Kradin RL,** Blumberg R, Schneeberger EE, Boyle LA: Functional characterization of T lymphocytes propagated from human lung carcinomas. Clin Immunol Immunopath 1986;38(3):367-380.

17. **Kradin RL,** McCarthy KM, Schneeberger EE: Opsonic receptor function is reduced on the surface of newborn alveolar macrophages. Am Rev Respir Dis 1986;133(2):238-244.

18. **Kradin RL,** McCarthy KM, Preffer FI, Schneeberger EE: Flow-cytometric and ultrastructural analysis of alveolar macrophage maturation. J Leuk Biol 1986;40(4):407-417.

19. **Kradin RL,** Zhu Y, Hales CA, Bianco C, Colvin RB: Response of pulmonary macrophages to hyperoxic pulmonary injury: Acquisition of surface fibronectin and fibrin/ogen and enhanced expression of a fibronectin receptor. Am J Pathol 1986;125(2):349-357.

20. **Kradin RL,** Kurnick JT. Adoptive immunotherapy of cancer with activated lymphocytes and interleukin-2. Pathol Immunopathol Res 1986;5:193-202.

21. **Kradin RL,** Lynch GW, Kurnick JT, Erickson M, Colvin RB, McDonagh J. Factor XIIIA is synthesized and expressed on the surface of U937 cells and alveolar macrophages. Blood 1987;69(3):778-785.

22. **Kradin RL,** Boyle LA, Preffer FI, Callahan RJ, Barlai-Kovach M, Strauss HW, Dubinett S, Kurnick JT. Tumor-derived interleukin-2-dependent lymphocytes in adoptive immunotherapy of lung cancer. Cancer Immunol Immunother 1987;24(1):76-85.

23. Fingert HJ, Chen Z, Mizrahi N, Gajewski WH, Bamberg MP, **Kradin RL.** Rapid growth of human cancer cells in a mouse model with fibrin clot subrenal capsule assay. Cancer Res 1987;47(14):3824-3829.

24. **Kradin RL,** McCarthy KM, Dailey CI, Burdeshaw A, Kurnick JT, Schneeberger EE. The poor accessory cell function of macrophages in the rat may reflect their inability to form clusters with T-cells. Clin Immunol Immunopath 1987;44(5):348-363.

25. **Kradin RL,** Kurnick JT. Interleukin 2 therapy for disseminated cancer. JAMA 1987;257:1729.

26. Nagy JA, Kradin RL, McDonagh J. Biosynthesis of factor XIII A and B subunits. Adv Exp Med Bio 1988;231:29-49.

27. **Kradin R,** Dubinett S, Mullin J, Boyle L, Strauss HW, Bourgoin PM, Preffer FI, Kurnick J. Treatment of patients with advanced cancer using tumor-infiltrating lymphocytes and interleukin 2. Transplant Proceed 1988;20(2):336-338.

28. **Kradin RL,** Kurnick JT. Adoptive immunotherapies with interleukin-2. MGH Cancer Bulletin Winter,1988.

29. **Kradin RL,** Kurnick JT, Preffer FI, Dubinett SM, Dickersin GR, Pinto C. Adoptive immunotherapy with IL-2 results in the loss of delayed-type hypersensitivity responses and the

development of immediate hypersensitivity to recall antigens. Clin Immunol Immunopath 1989;50(2):184-195.

30. **Kradin RL**, McCarthy KM, Gifford J, Schneeberger EE. Antigen-independent binding of T-cells by dendritic cells and aveolar macrophages in the rat. Am Rev Resp Dis 1989;139(1):207-211.

31. Thompson PT, Hassoun PM, Kradin RL, Hales CA. Acute and chronic hypoxic pulmonary hypertension in guinea pigs. J Applied Physiol 1989;66(2):920-928.

32. **Kradin RL**, Kurnick JT, Lazarus DS, Preffer FI, Dubinett SM, Pinto CE, Gifford J, Davidson E, Grove B, Callahan RJ, Strauss HW. Tumour-infiltrating lymphocytes and interleukin-2 in the treatment of advanced cancer. The Lancet 1989;1(8638):577-580.

33. Gallagher WJ, Dubinett SM, Hoover CJ, **Kradin RL**. Efficacy of adjuvant interleukin-2 after excision of BALB/c fibrosarcomas. Surgery 1989;106(2):120-125.

34. Preffer FI, Kim CW, Fischer KH, Sabga EM, **Kradin RL**, Colvin RB. Identification of pre-T cells in human peripheral blood: extrathymic differentiation of $CD7^+CD3^-$ cells into $CD3^+ \gamma/\delta^+$ or $\alpha/\beta^+$ T cells. J Exp Med 1989;170(1):177-190.

35. Wong JT, Pinto CE, Gifford JD, Kurnick JT, **Kradin RL**. Characterization of the CD4+ and CD8+ tumor infiltrating lymphocytes propagated with bispecific monoclonal antibodies. J Immunol 1989;143(10):3404-3411.

36. Dubinett SM, Kurnick JT, **Kradin RL**. Adoptive immunotherapy of murine pulmonary metastases with interleukin 2 and interferon-gamma. Am J Respir Cell Mol Biol 1989;1(5):361-369.

37. Kradin RL, Kurnick J, Gifford J, Pinto C, Preffer F, Lazarus D. Adoptive immunotherapy with interleukin-2 (IL-2) results in diminished IL-2 production by stimulated peripheral blood lymphocytes. J Clin Immunol 1989; 9(5):378-385.

38. Lazarus DS, Kurnick JT, **Kradin RL**. Alterations in pulmonary function in cancer patients receiving adoptive immunotherapy with tumor-infiltrating lymphocytes and Interleukin-2. Am Rev Resp Dis 1990;141(1):193-198.

39. Yamin M, Lazarus D, Schneeberger EE, McCarthy K, Xia WJ, **Kradin R**. Anti-RMA: A murine monoclonal antibody that activates rat macrophages: I. Distribution and characterization of the RMA antigen. Am J Respir Cell Mol Biol 1990;2(2):207-215.

40. Lazarus D, Yamin M, McCarthy K, Schneeberger EE, **Kradin R**. Anti-RMA, a murine monoclonal antibody, activates rat macrophages: II. Induction of DNA synthesis and formation of multinucleated giant cells. Am J Respir Cell Mol Biol. 1990;3(2):103-111.

41. **Kradin RL**, McCarthy KM, Xia WJ, Lazarus D, Schneeberger EE. Accessory cells of the lung. I. Interferon-gamma increases $Ia^+$ dendritic cells in the lung without augmenting their accessory activities. Amer J Respir Cell Mol Biol 1991; 4(3):210-218.

42. Xia WJ, Schneeberger EE, McCarthy K, **Kradin RL**. Accessory cells of the Lung: II. $Ia^+$ pulmonary dendritic cells display cell surface antigen heterogeneity. Am J Respir Cell Mol Biol 1991;5(3):276-283.

43. Marathias KP, Preffer FI, Pinto C, **Kradin RL**. Most human pulmonary infiltrating lymphocytes display the surface immune phenotype and functional responses of sensitized T cells. Am J Respir Cell Mol Biol 1991;5(5):470-476.

44. Dubinett SM, Callahan RJ, Xia WJ, Ahmad M, Strauss HW, **Kradin RL**. Cytokine administration alters the distribution of activated lymphocytes to the lung. Pathobiology 1991;59(6):372-377.

45. Bennett WT, Pandolfi F, Grove BH, Hawes GE, Boyle LA, **Kradin RL** and Kurnick JT. Dominant rearrangements among human tumor-infiltrating lymphocytes: Analysis of T-cells derived from 32 patients with melanoma, lung, and renal cell carcinoma. Cancer 1992;69(9):2379-2384.

46. Antoniades HN, Neville-Golden J, Galanopoulos T, **Kradin RL**, Valente AJ, Graves DT. Expression of monocyte chemoattractant protein 1 mRNA in human idiopathic pulmonary fibrosis. Proc Natl Acad Sci USA 1992;89(12):5371-5375.

47. Ilson DH, Motzer RJ, **Kradin RL**, Vogelzang NJ, Bajorin DF, Scher HI, Nanus D, O'Moore P, Marathias K, and Bosl GJ. A phase II trial of Interleukin-2 and Interferon alpha-2a in patients with advanced renal cell carcinoma. J Clin Oncol 1992;10(7):1124-1130.

48. McDonagh J, Fossel ET, **Kradin RL**, Dubinett SM, Laposata M, Hallaq YA. Effects of tumor necrosis factor-$\alpha$ on peroxidation of plasma lipoprotein lipids in experimental animals and patients. Blood 1992;80(12):3217-3226.

49. **Kradin RL**, Xia W, McCarthy K, Schneeberger EE. FcR$^+$-subsets of Ia$^+$ pulmonary dendritic cells in the rat display differences in their abilities to provide accessory co-stimulation for naive (OX-22$^+$) and sensitized (OX-22$^-$) T cells. Am J Pathol 1993;142(3):811-819.

50. Dubinett SM, **Kradin RL**. Cytokine immunotherapy of non-small cell lung cancer. Regional Immunol 1993;5(3-4):232-243.

51. VanderMeer TJ, Menconi MJ, O'Sullivan BP, Larkin VA, Wang H, Kradin RL, Fink MP. Bactericidal/permeability increasing protein ameliorates acute lung injury in porcine endotoxemia. J Appl Physiol 1994;76(3):2006-2014.

52. Tsao TC, Xia W, Rodberg GM, Pinto CE, **Kradin RL**. Interferon-gamma and tumor necrosis factor-alpha promote the binding of dendritic cells to fibronectin. Pathobiology 1994;62(3):120-126.

53. Marathias K, Pinto C, Rodberg G, Preffer F, Wong J, **Kradin R**. The T cell antigen receptor CD3:CD4 molecular complex is diminished on the surface of pulmonary lymphocytes. Am J Pathol 1994;145(5):1219-1227.

54. Xia W, Pinto CE, **Kradin RL**. The antigen-presenting activities of Ia$^+$ dendritic cells shift dynamically from lung to lymph node after an airway challenge with soluble antigen. J Exp Med 1995;181(4):1275-1283.

55. Fava M, Nolan S, **Kradin** R, Rosenbaum J. Gender differences in hostility among depressed and medical outpatients. J Nerv Ment Dis 1995;183(1):10-14.

56.   **Kradin RL**.  The immune self: A selectionist theory of recognition, learning, and remembering within the immune system.  Perspect Biol Med  1995;38(4):605-623.

57.   Pollack MH, **Kradin R**, Otto MW, Worthington J, Gould R, Sabatino SA, Rosenbaum JF. Prevalence of panic in patients referred for pulmonary function testing at a major medical center. Am J Psychiatry  1996;153(1):110-113.

58.   MacLean JA, Xia W, Pinto CE, Zhao L, Liu H-W, **Kradin RL**.  Sequestration of inhaled particulate antigens by lung phagocytes: a mechanism for the effective inhibition of pulmonary cell-mediated immunity.  Am J Pathol  1996;148(2):657-666.

59.   Smoller JW, Pollack MH, Otto MW, Rosenbaum JF, **Kradin RL**.  Panic anxiety, dyspnea, and respiratory disease: theoretical and clinical considerations.  Am J Respir Crit Care Med 1996;154(1):6-17.

60.   Sharma SK, MacLean JA, Pinto C, **Kradin RL**.  The effect of an anti-CD3 monoclonal antibody on bleomycin-induced lymphokine production and lung injury.  Am J Respir Care Crit Med 1996;154(1):193-200.

61.   **Kradin RL**, Xia W, Pike M, Byer HR, Pinto C.  Interleukin-2 promotes the motility of dendritic cells and their accumulation in lung and skin.  Pathobiology 1996; 64(4):180-186.

62.   Liu H-W, Anand A, Bloch K, Christiani D, **Kradin R**.  Expression of inducible nitric oxide synthase by macrophages in rat lung.  Am J Respir Crit Care Med  1997;156(1):223-228.

63.   **Kradin, RL**.  The psychosomatic symptom and the self: A Sirens' Song.  J Analytical Psychology 1997;42(3):405-423.

64.   **Kradin R**, MacLean J, Duckett S, Schneeberger EE, Waeber C, Pinto C.  Pulmonary response to inhaled antigen: Neuroimmune interactions promote the recruitment of dendritic cells to the lung and the cellular immune response to inhaled antigen. Am J Pathol  1997;150(5):1735-1743.

65.   Smoller JW, Pollack MH, Systrom D, **Kradin RL**.  Sertraline effects on dyspnea in patients with obstructive airways disease. Psychosomatics  1998;39:24-29.

66.   Krinzman S, Basgoz N, **Kradin R**, Shepard J-A O, Flieder DB, Wright CD, Wain JC, Ginns LC. Respiratory syncytial virus-associated infections in adult recipients of solid organ transplants.  J Heart Lung Transplant.  1998;17:202-10.

67.   Rodberg GM, **Kradin RL**.  Epinephrine augments specific T-cell responses to antigen in C57BL/6 (H-2b) weak-responder mice by a CD8+ lymphocyte dependent mechanism.  Pathobiology 1998;66:84-89.

68.   **Kradin RL**, Liu H-W, van Rooijen N, Springer K, Zhao L-H, Leary CP.  Pulmonary immunity to listeria is enhanced by alveolar macrophages.  Am J Respir Crit Care Med  1999;159:1967-1974.

69.   Wilson SN, van der Kolk B, Burbridge J, Fisler R, **Kradin R**.  Phenotype of blood lymphocytes in PTSD suggests chronic immune activation.  Psychosomatics  1999;40:222-225.

70. Tager A, Luster A, **Kradin R**.  T-cell chemokines interferon-inducible protein-10 and monokine induced by interferon-gamma are upregulated in bleomycin-induced lung injury.  Chest 1999;116:90S.

71. Tager A, Luster A, Leary C, Sakamoto H, Zhao L-H, Preffer F, **Kradin R**.  Accessory cells with immunophenotypic and functional features of monocyte-derived dendritic cells are recruited to the lung during pulmonary inflammation.  J Leukoc Biol  1999;66:901-908.

72. Smoller, J, Simon, N, Pollack, M, **Kradin, R**, Stern, T. Anxiety in patients with pulmonary disease:comorbidity and treatment. 1999. Sem in Clin Neuropsychaitry. 4:84-97

73. **Kradin R**, Sakamoto H, Preffer F, Dombkowski D, Springer K, Leary C.  Accumulation of macrophages with dendritic cell characteristics in the pulmonary response to listeria.  Am J Respir Crit Care Med. 2000;61:535-542.

74. Duckett S, **Kradin R**, Galle P.  The pathogenesis of beryllium-induced pulmonary granulomatosis. A scanning secondary ion analytical microscopy study.  Life Sciences 323 (2000) 1-6.

75. **Kradin R**.  Stress, the relaxation response and immunity.  Mod Asp Immunobiol  2000;1(3):110-113.

76. Manfro GG, Pollack MH, Otto MW, Worthington JJ, Rosenbaum JF, Scott EL, **Kradin RL**.  Cell-surface expression of L-selectin (CD62L) by blood lymphocytes: correlates with affective parameters and severity of panic disorder.  Depression & Anxiety. 2000;11(1):31-37.

77. **Kradin R**, Rodberg G, Zhao L, Leary C.  Epinephrine yields translocation of lymphocytes to the lung.  Exp Mol Pathology 2001 70:1-6

78. Sakamoto H, Zhao L-H, Jain F, **Kradin R**. IL-12p40 mice treated with intratracheal bleomycin exhibit decreased pulmonary inflammation and increased fibrosis. Exp. Mol Pathol 2002: 72:1-9.

79. Jain, F, Zhao, L-H, Selig, M, **Kradin, R**. Epinephrine promotes pulmonary angiitis:evidence for a $\beta 1$ receptor mediated mechanism. Amer J. Physiol. 2003. 285:232-9.

80. Manfro, G, Nett, A, Pollack, M, Mezzomo, K, Preffer, F, **Kradin, R**. Stress regulates the lymphocyte homing receptor CD62L. Arq Neuro-Psiquiatrica. 2003. 61:20-4

81. Tager, A, **Kradin, R**, La Camera, P, Bercury, S,  Campanella, G, . Leary, C, Polosukhin, V., Zhao, L-H, Sakamoto, H, Bl;ackwell, TS, Luster, A. Regulation of pulmonary fibrosis by the chemokine IP-10/CXCL10. American Journal of Respiratory Cell & Molecular Biol. 2004. 31:395-404.

82. Varnholt, H., **Kradin, R**. Pulmonary capillary hemangiomatosis in hereditary hemorrhagic telangiectasia. Human Pathology. 2004. 35: 266-268.

83. **Kradin, R**, Sakamoto, H, Jain, F, Zhao, L, Hymowitz, G, Preffer, F. IL-10 inhibits inflammation but does not affect fibrosis in the pulmonary response to bleomycin. 2004. J Exp Mol. Pathol.

84. Chen, Y-C, Chen, J-H, **Kradin**, R, Chen, P-Y, Christiani, D.C. Lung adenocarcinoma and human papillomavirus. Cancer. 2004. 101:1428-36.

85. **Kradin, R**.  The Placebo Response. Perspectives in Biology and Medicine. 2004. 47:328-38.

12

86.   **Kradin, R.** The Placebo Response Complex. J. Analytical Psychol. 2004 50; 18-29.

87.   **Kradin, R** and Mark, E. Nitric oxide synthase expression in pulmonary capillary hemangiomatosis. Experimental and Molecular Pathology. 2005. 79: 194-197

88.   **Kradin, R,** Coon, D, Roberts, D. Expression of sonic hedgehog and fox in chronic interstitial pneumonia   Exp Mol Pathol 2006; 80:119-123.

89.   Simon, N,Weiss, A, **Kradin, R,** Evans, K, Reese, H, Otto, M, Oppenheimer, J, Smoller, J, Worthington, J, Pollack, M. Relationship of anxiety disorders, anxiety sensitivity and pulmonary dysfunction with dyspnea related distress and avoidance. Psychosomatics. In Press.

90.   **Kradin, RL,** Auluck, P, Lauwers, G. Iatrogenic Infection by Trichuris Suis. Arch Pathol Lab Med. 2006. 130:718-720.

91.   **Kradin, RL** and Mark, EJ.  Distinguishing benign mesothelial hyperplasia from neoplasia. Seminars in Diagnostic Pathology.  2006. 23:25-34.

92.   Mark, EJ and **Kradin, RL**. Pathological recognition of diffuse malignant mesothelioma of the pleura: the significance of the historical perspective as regards this signal tumor. Seminars in Diagnostic Pathology 2006. 23:4-14

93.   Farris, A.B. and **Kradin, RL**.  Morular Localization of Dendritic Cells in a Xanthomatous Inflammatory Tumor of Lung Associated with Human Herpes Virus-8 Infection. Virchow's Arch. 2006. 449:726-29.

94.   Saenz A. Mandal R. **Kradin R.** Hedley-Whyte ET. Nephrogenic fibrosing dermopathy with involvement of the dura mater. Virchows Arch. 2006. 449:389-91.

95.   Farris, A.B., Mark., E.J., **Kradin, R.L.**  Pulmonary inflammatory myofibroblastic tumors: a critical examination of the diagnostic category based on quantitative immunohistochemical analysis. Virchows Arch. 2007 450:585-590.

96.   Mandal, R.V., Mark, E., and **Kradin, R.L.** Megakaryocytes and platelet homeostasis in diffuse alveolar damage. 2007.87:327-331.

97.   Roehrl, M. and **Kradin,** Roehrl, M. and **Kradin, R.L.** Pulmonary oxalosis. Virchows Arch. 2007.451;1067-1073..

98.   **Kradin, R.L.** and Mark, E.J. The pathology of pulmonary disorders due to Aspergillus spp. 2008. Arch Pathol Lab Med. 2008. 132:606-614

99.   Mark, E. Ruancchira-Urai, R., and **Kradin, R**. Shirt-sleeve or scanning magnification as an aid to the diagnosis of commonly encountered medical lung disorders. Arch Pathol Lab Med. 2008. 539-547.

100.  Mandal, R., Mark, E.J., **Kradin, R**.Organizing pneumonia and lymphatic architecture predict prognosis in lung biopsies of patients with ARDS. Human Pathology. 2008.39:1234-1238.

101.  . Ruangchira-Urai, R, Colby, TV, Klein, J, Nielsen, GP, **Kradin, RL,** Mark, EJ. Nodular amiodarone lung disease. Am J Surg Pathol 2008. 32:1654-1660

13

102. E.J. Mark, Mewng, F., **R.L. Kradin**., Mathisen, D.J. Idiopathic tracheal stenosis. Am J Surg Pathol.2008. 1138-1143.

103. Nehra, D, Liberman, M, Vagefi, P., Evans, N, Inglessis, I, **Kradin, R**., Ono, J, Kanarek, D, Gaissert, Complete pulmonary venous occlusion after radiofrequency ablation for atrial fibrillation. Ann Thorac Surg. 2009. 87:292-295.

104. . Farris, A.B., Mark, E.J., **Kradin**, R.L. Diffuse cellular and fibrosing interstitial pneumonitis with dequamative interstitial pneumonitis-like features associated with myeloid neoplasia . Am J Surg Path. 2009. 33:1485-149

105. Saenz, A, Koreishi, S., Rosenberg, A, **Kradin, R.L**.. Necrotizing fasciitis: an immunohistochemical analysis. Virchows Arch 2009. 455:87-92

106. Marconi VC, **Kradin R**, Marty FM, Hospenthal DR, Kotton CN Disseminated dermatophytosis in a patient with hereditary hemochromatosis and hepatic cirrhosis: case report and review of the literature.Med Mycol . 2010. 48, 518-27

107. **Kradin, R.L**. Placebo response in therapeutics. Psychiatry reports. 2010. 1-6.

108. Nishimo, M, Medoff, B, O'Donnell, W., Mark, E. Currier, P. **Kradin, R.L**. Variant lipoproteinosis: A clinico-pathologic disorder with distinct responses to treatment. Pathol Int. 2011 Sep;61(9):509-17

109. Choi NC, T. Chun, A. Niemierko, M. Ancukiewicz, P Fidias, **R Kradin**[1], D Mathisen , T. Lynch A. Fischman. FDG Uptake Quantified with FDG PET 10-12 Days after radiotherapy or chemoradiotherapy in lung cancer is molecular-biomarker capable of predicting therapy outcome and identifying patients in need of timely salvage therapy. International Journal of Radiation Oncology Biology Physics. 2010 .78:34.M.,

110. Kradin **R**. Psychosomatic disorders: canalization of mind into matter. **Journal** of **Analytical Psychology.** *2011 56: 37-55.*

111. Chung J, **Kradin R**, Greene R, Shepard JO, Digumarthy S. CT predictors of mortality in pathology   confirmed ARDS  European Radiology 2011 21:730-738.

112. **Kradin, R.L**.,Sheldon, TA,  Nielsen., P., Selig M., Hunt, J. Malacoplakia of the tongue complicating the site of irradiation for squamous cell carcinoma with review of the literature. Annals of Diagnostic Pathology 2011. [e-published ahead of print].

113. **Kradin, R.L**. The placebo response: an attachment strategy that counteracts the deleterious effects of chronic stress. Perspect Biol Med. 2011 Autumn;54(4):438-54.

114. Shun, O.S., Uddin, T., Citorik, R., Wang, J.P., Della Pelle, P, **Kradin, R.L**., Bingle, C.D., Camili, A., Ryan, E.T., Calderwood, S.B., Finberg, R.W., Qadri, F.Q., LaRocque, R. C., Harris, J.B. LPUNC1 modulates innate immune responses to vibrio cholerae infection. J. Infectious Disease. J Infect Dis. 2011 Nov;204(9):1349-57

115. Reisman, J, Ponce, C. **Kradin, R.L**. Monomicrobial pseudomonas necrotizing fasciitis:A review of 37 cases. Scandinavian Journal of Infectious Disease. In Press.

14

116.   **Kradin, R.L.** Guiding the pulmonologists hand. Arch of Pathol Lab Med. 2012. 136:1528-32

117.   Nishino, M., Matthai, S, Digumarty, S. **Kradin, R.** The prognostic importance of pathologic findings in patients with organizing pneumonia, a clinico-pathological study.. Human Pathology.2014. 370:342-51.

118.   Bledsoe, J, Christiani, D.C., **Kradin, R.L.** Smoking-related fibrosis confounds the clinical diagnosis of pulmonary asbestosis. J. of Chronic Obstructive Pulmonary Dis. 2014. 10:31-37.

119.   Kovach, A. Cheng, G., Channick, C., Channick, R., Miniappan, A, Gaissert, H., **Kradin,** R.The pathology of pulmonary vein radiofrequency ablation: Case reports and a review of the literature Annals Diagnostic Pathology 2013. 17:46-52

120.   **Kradin, R.L.** When ancestral heritage is a source of discomfort: culture, pre-object relatedness and self-alienation. 2013. J Anal Psych 57:207-222.

121.   Hariri, L, Greene, R, Brown, R., **Kradin, R.L.** Progressive pulmonary disease secondary to subcutaneous administration of silicone in HIV-1 infection. Arch Pathol Lab Med. 2012 Feb;13 6(2):204-7.

122.   Choi, N, Chun, T, Niermeko, A, Ancukiwicz, M, Fidias, P, **Kradin, R,** Mathisen, D, Lynch, T. , Fischman, A.  Potential of 18-F-FDG PET towards personalized radiotherapy or chemoradiotherapy in lung cancer.  Published on-line Eur J Nucl Mol Imaging 2013

123.   Primiani, A., Iafrate, J, **Kradin, R.** Smoking-related fibrosis and the mutational spectrum in pulmonary adenocarcinomas. J. of Chronic Obstructive Lung Diseases.2014. 9:525-31.

124.   Musch G, Winkler T, Harris RS, Vidal Melo MF, Wellman TJ, de Prost N, **Kradin** RL,   . Lung [18F]fluorodeoxyglucose uptake and ventilation-perfusion mismatch in the early stage of experimental acute smoke inhalation. Anesthesiology. 2014 Mar;120(3):683-93

125..**Kradin, R.L.** Obsessionality, addiction, and ritual. J. Anal. Psych. 2014. 59:346-65

125.   Farmer· JR, Sokol· C, Bonilla,AF, Mural, M,  **Kradin,** R, Astor· T, Abraham· J, and Walter, JE. Bilateral lung transplantation in a patient with humoral immune deficiency, a review of the literature. 2014. pp 910215

126. Dubrock, H, **Kradin, R.** Gonzales, R, Channick, R. Pulmonary capillary hemangiomatosis: The role of cardiopulmonary exercises testing in the diagnosis. Pulmonary Circulation. 2015.5:580-86.

127. Kovach, A, Channick, R, Rodriguez, J, Wright, C, Vlahakes, G, **Kradin, R.** Thromboendarterectomy in the treatment of chronic thromboembolic pulmonary hypertension. 2015. The role of histology in assessment.  2017. Integrative Clinical Medicine

128.  Swigris, J and **Kradin, R.** EXPLORE IPF: A survey evaluatiing patients and caregivers perspectives   in idipodathic pulmonary fibrosis.  2015. Chest.

129. **Kradin, R,** Iafrate, J, Christiani, D. EGFR receptor expression in asbestos exposed non-smokers with pulmonary adenocarcinoma . 2017. Amer. J. Industrial Medicine.

130. Taylor, M, Rajagopal, J., O'Donnell, W, **Kradin, R.L.** Delayed alveolar re-epithelialization in patients with acute lung injury: a potentially novel and unrecognized cause of ARDS. In Press. Am J. Pathol.

131. **Kradin, R.**, Eng, G, Christiani, D. Diffuse peritoneal mesothelioma: 62 cases in asbestos-exposed individuals including paraoccupational exposures to chrysotile. 2017  Amer J Indust Med.

132. **Kradin, R**, Iafrate, J, Christiani, D. EGFR receptor expression in asbestos exposed non-smokers with pulmonary adenocarcinoma . 2017. Amer. J. Industrial Medicine.

133. Moskowitz, A, Astor, T, Selig, M, Cheng, G., **Kradin, R.** Relationship between alveolar wall thickness and lung function in orthotopic lung grafts. 2017. In Press. Am. J. of Pathology.

134. Lane RJ , **Kradin, RL**, Xia D, Buchan CA, Turbett S, Kotton CN , Mansour MK Malakoplakia in thoracic transplant recipients. In Press. Annals of Internal Medicine.

135. Shi, A and **Kradin, R**. Malignant mesothelioma in Lynch Syndrome. In preparation.

136. Montesi, S, **Kradin, R,** Sharma, A, Ginns, L. Pulmonary pathologies in celiac disease. In preparartion.

## Reviews, Chapters, and Editorials:

1. **Kradin RL**.  The role of monoclonal antibodies and molecular biology in pulmonary medicine. Pulmonary and Critical Care Update  1987;3:1-8.

2. **Kradin R**, Yamin R, Kurnick J.  Immunological effects of adoptive immunotherapy with IL-2: An overview.  Pathol Immunopathol Res  1988;7(6):434-441.

3. **Kradin R**, Kurnick J, Preffer F, Strauss W, Wong J, Bennett W.  Tumor- infiltrating lymphocytes and Interleukin-2 in the treatment of advanced cancer.  In: Biological Agents in the Treatment of Cancer.  P. Hersey, Editor.  Proceedings of the International Conference, Newcastle.  1990.

4. Kurnick JT, **Kradin RL**.  Adoptive immunotherapy with recombinant interleukin 2, LAK and TIL. Allerg et Immunopath  1991;19(5):209-214.

5. **Kradin RL**, Bhan AK.  Tumor infiltrating lymphocytes.  Lab Invest  1993;69(6):635-638.

6. **Kradin RL**.  Review.  Pulmonary Pathology - Tumors.  (Dail DH, Hammar SP and Colby TV). New Engl J Med  1995;333(12):809-810.

7. **Kradin RL**. The pulmonary immune response to asbestos.  Asbestos and Cancer.  1997. 16:1-6

8. **Kradin RL**.  Review.  Pathology of Occupational Lung Disease, 2nd Edition, Williams & Wilkins, Baltimore, MD, pp, 1-497, 1998.

9. **Kradin, RL**. Review. Thurlbeck's Pathology of the Lung. 3rd Edition. New York.  Respiratory Care. 51:5, 2006

10.  **Kradin, RL.** Pathology for Management of Infective Endocarditis in Infective Endocarditis in the Era of Intravascular Devices. J.L. Brusch Editor. 2007. Taylor & Francis. New York.

11.  Novak, D. A., Lauwers, G.Y., **Kradin, R.L**, Dolson, D.J. Bacterial, parasitic , and fungal infections of the liver. Liver Disease in Children. Eds. Suchy, F.J., Sokol, R.J., and Balisteri, W.F.. Lippincott Williams &Wilkins. 2007.

12.  **Kradin, R**.L. Pathology of Aspergillus Infection. In Aspergillus:From Diagnosis to Prevention 2011

13.  **Kradin, R.L.**. Imagination and Medicine. Eds. S. Aiszenstadt and R. Bosnak, Spring, Dallas

14.  **Kradin, R.L.** Fishman, J. Pathology of Viral Infections. In A Spencer's Pathology of the Lung. Eds. P. Hasleton and D. Flieder Kradin, R.L. 2012.

15.  **Kradin, R**. Have you seen my servant Job: A examination of the transformative role of suffering. In Answering a Question with a Question?. 2014 Academic Studies Press Boston.

16.  **Kradin, R.L.** Review: R. Whittaker's Anatomy of an Epidemic. In Press. J Analyt Psychol.

17.  **Kradin RL.** Lung Disease. In: Textbook of Consultation Liaison Psychiatry-Second Edition. Greenberg, D., ed. American Psychiatric Press Inc. Washington, DC. 2014

18.  **Kradin, RL**. Honeycomb Lung: Time for a Change. Archives of Pathol and Lab Med. In Press 2015.


## Books, Monographs, and Textbooks

1.  Nagy JA, **Kradin RL**, McDonagh J. Biosynthesis of factor XIII A and B Subunits. Post-Translational Modifications of Proteins and Aging. (V. Zappia ed.) Plenum Publishers, New York 1987; 29-49.

2.  **Kradin RL**. Adoptive immunotherapy with tumor infiltrating lymphoyctes. In: Therapeutic Applications of Interleukin-2. Atkins, Meir, eds. Marcell Dekker, Inc., New York. 1993:217-231.

3.  **Kradin RL**, Rodberg GM. The Immunoanatomy of the Lung. In: Diagnostic Immunopathology - Second Edition. Colvin RB, Bhan AK and McCluskey RT, eds. Raven Press,Ltd. New York 1995:155-177.

4.  **Kradin RL**, Robinson BW. Immunopathology of Lung Disease. Butterworth, Boston; 1996.

5.  Greenberg DB, Kradin RL. Lung Disease. In: Consultations Psychiatry. Wise MG and Rundell J, eds. Am Psych Assoc Press. Washington, D.C. 1996:561-566.

6.  **Kradin R**. Regulation of Dendritic Cell Recruitment and Traffic in the Lung. In: Lung Macrophages and Dendritic Cells. Lipscomb M, and Russell, eds. Marcel Dekker, Inc., New York. 1996:267-281.

7.   Greenberg DB and **Kradin RL**.  Lung Disease. In: <u>Textbook of Consultation Liaison Psychiatry-Second Edition</u>.  Rundell JR and Wise MG, eds. American Psychiatric Press Inc.  Washington, DC. 1996.

8.   Malhotra A, **Kradin R**.  The Pulmonary Immune Response to Asbestos.  In: <u>Sourcebook on Asbestos Diseases</u>.  1997:16:1-16.

9.   **Kradin RL**.  Lung Disease. In: <u>Textbook of Consultation Liaison Psychiatry-Third Edition</u>. Rundell JR and Wise MG, eds. American Psychiatric Press Inc.  Washington, DC. 1996.

10.  **Kradin R**, Surman O.  Psychoneuroimmunology and organ transplantation: <u>The Transplant Patient: biological, psychiatric and ethical issues in organ transplant</u>.  Paula Trzepacz and Andrea Dimartini; eds. Cambridge University Press, Cambridge, United Kingdom. 2000:225-274.

11.  **Kradin, RL**. <u>The Herald Dream.</u> Karnac Press. London. 2006

12.  **Kradin, R**. <u>The Placebo Response</u>. Routledge, .London  2008

13.  **Kradin, R.**  <u>The Surgical Pathology of Infectious Disease</u>. W.B. Saunders. Philadelphia .2010.

14.  **Kradin, R**.L. and Fishman, J. *Viral Infections* in Spencer's <u>Pathology of the Lung</u>. Ed. D. Flieder 2010

15.  Novak, D. A., **Kradin, R.L**, 2nd Edition 2014.   Bacterial, parasitic , and fungal infections of the liver. <u>Liver Disease in Children.</u> Eds. Suchy, F.J., Sokol, R.J., and Balisteri, W.F.. Lippincott Williams & Wilkins.

16.  Fraire, A and  **R. Kradin, Eds**. 2014. <u>Viral Diseases of the Lung. Springer</u>

17.  **Kradin, R.L**. <u>The Pathologies of the Mind/Body Interface: Curious Domain of the Psychosomatic Disorders</u>. 2012.  Routledge. London.

18.  **Kradin, R**.  <u>Understanding Pulmonary Pathology.</u> 2016. Academic Press. Amsterdam.

19.  **Kradin, R**. <u>Out of Control: Apocalyptic Psychology in the Age of Trump.</u> 2018. Amazon .

20.  **Kradin R**. Bacterial infections of the lung.in Seminars of Diagnostic Pathology. 2017

21.  **Kradin, R.**  <u>The Surgical Pathology of Infectious Disease.</u> W.B. Saunders. Philadelphia .2010.

<u>**Letters to the Editor**</u>

1.   **Kradin R**.  Letter to the Editor.  La Caravella.  Fall, 1994; p. 30.

2.   **Kradin R**.  Reply to Tauber. (Letter; Comment)  Immunol. Today 1995; 16(2): 109.

3. Taylor, M, Rajagopal, J., O'Donnell, W, **Kradin, R.L**. Delayed alveolar re-epithelialization in patients with acute lung injury: a potentially novel and unrecognized cause of ARDS. Am. J. of Resp and Critical Care Medicine. 2017.

## Case Records of the Massachusetts General Hospital and the New England Journal of Medicine (Selected)

1. Make BJ, **Kradin RL**. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 45-1983: A young man with a mass involving the lung, pleura, and chest wall. New Engl J Med. 1983. 309(19):1171-1178.

2. Seidman JM, **Kradin RL**. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 23-1984: A 62-year-old woman with asthma and pulmonary infiltrates. New Engl J Med. 1984. 310(23):1518-1524.

3. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 49-1984: A 64-year-old man with rheumatoid arthritis and cavitary pulmonary disease. New Engl J Med. 1984. 311(23):1496-1505.

4. Schoenbaum SC, **Kradin RL**. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 18-1988: A 30-year-old man with bilateral pulmonary consolidation and cavitation. New Engl J Med. 1988. 318(18):1186-1194.

5.. Gabor EP, **Kradin RL**. Correspondence: Case 28-1989: Pulmonary infiltrates and an axillary mass. New Engl J Med. 1990. 322(2):131.

6. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 28-1989: A 65-year-old man with pulmonary infiltrates and an axillary mass. New Engl J Med. 1989. 321(2):102-110.

7. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 39-1991: A 46-year-old man with fever, a cough, and bilateral pulmonary nodules. New Engl J Med. 1991. 325(13):949-956.

8. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 1-1993: A seven-year-old girl with recurrent bouts of sore throat, cough, dyspnea, and fever. New Engl J Med. 1993. 328(1):48-55.

9. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 23-1996: A 62-year-old woman with progressive dyspnea and diffuse reticulonodular pulmonary infiltrates. New Engl J Med. 1996. 335(4):266-273.

10. **Kradin RL**, Mark EJ. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 20-1997: A 74-year-old man with progressive cough, dyspnea, and pleural thickening. New Engl J Med. 1997. 336(26):1895-1903.

11. **Kradin RL**, Mark EJ.  Case Records of Massachusetts General Hospital: Weekly clinicopathological exercises: Case 32-1998: An 83-year-old woman was admitted to the hospital because of asthma complicated by pneumonia that was unresponsive to antibiotic treatment. N Eng J Med.  1998.  339:1144

12. **Kradin RL**, Mark EJ.  Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 06-2000: A 20-year-old man was admitted to the hospital because of back pain and hemoptysis.  N Eng J Med. 2000.  342:572-578.

13. Nutman, T, **Kradin, R**.  Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 1-2002. A 24-year-old woman with paresthesias and muscle cramps after a stay in Africa. N Eng J Med. 2002. 346:115-22.

14. Hajjar, R , **Kradin R**. Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: Case 17-2002. A 55-year-old man with second-degree heart block and chest pain. N Eng J Med.  2002. 246:1732-38.

15. Gerberding, J., **Kradin, R**. . Case Records of the Massachusetts General Hospital: Weekly clinicopathological exercises: An 18-year-old man with respiratory symptoms and shock. Case 9- N Eng J Med.  2004. 1236-47.

16. O'Donnell, WJ, **Kradin, RL**, Evins, AF, Wittram, C. Case Records of the Massachusetts General Hospital. Weekly clinicopathological exercises. Case 39-2004. A 52-year-old woman with recurrent episodes of atypical pneumonia. N Eng J Med.  2004 351: 2741-9.

17. Rubin R. H., Gilman M. D, **Kradin, R**. L.  Case Records of the Massachusetts General Hospital.: Case 1-2006. A 64-Year-Old Male Lung-Transplant Recipient with Fever, Cough, Hemoptysis, and Abdominal Pain 2006; 354:180-187.

18. Hurtado R. M., Sahani D. V., **R.L Kradin**. Case Records of the Massachusetts General Hospital .http://content.nejm.org/cgi/content/short/354/12/1295 N Engl J Med Weekly clinicopathological exercises. Case 9-2006- A 35 year-old woman with recurrent right upper quadrant pain. N Engl J Med 2006; 354:1295-1303.

19. Ryan, E.T., Aquino, S.L., **Kradin, R.L**. Case Records of the Massachusetts General Hospital http://content.nejm.org/cgi/content/short/354/12/1295 N Eng J Med Weekly clinicopathological exercises. Case 29-2007. A 51 year old man with gastric cancer and lung nodules. N. Eng J. Med. 2007. 357:1239-1246.

20. Harris, J.B. Michelow, I.C. , Westra, S.J., **Kradin, R.L**. Case 21-2008. An 11 month old nboy with fever and pulmonary infiltrates. N Eng J Med 2008. 359:178-187.

21. Filbin, MR, Ring, DC, Wessels, MR, Avery, LI, **Kradin, RL**. Case Records of the Massachusetts General Hospital http://content.nejm.org/cgi/content/short/354/12/1295 N Engl J Med Weekly clinicopathological exercises. Case 2-2009. N Eng J Med. 360:281-290.

22. Kotton CN, Elias N, Delmonico, FL, **Kradin, RL**. Case Records of the Massachusetts General Hospital http://content.nejm.org/cgi/content/short/354/12/1295 N Engl J Med Weekly clinicopathological exercises. Case 2-2009. N Eng J Med. 360:2118-25.

20

23. **Kradin**, RL, Digumarthy, S., Bagisch, A., Mark, E.J.   Case Records of the Massachusetts General Hospital http://content.nejm.org/cgi/content/short/354/12/1295 N Engl J Med Weekly clinicopathological exercises. Case 12-2010. N Eng J Med. 362: 1522-31.

24. **Kradin, RL,** Digumarthy SR, Mark EJ. Case records of the Massachusetts General Hospital. A 53 year old man with chest pain and pleural effusion . 2012. In Press..

25. Heller HM, Wu CC, Pierce VM, **Kradin** RL. Case records of the Massachusetts General Hospital. Case 31-2013. A 29-year-old man with abdominal pain, fever, and weight loss. N Engl J Med. 2013 Oct 10;369(15):1453-61.

26. Chiappa, V, Chang, C, Sellas, M, Pierce, V, **Kradin, R.L.** A 45 year old man with a rash. Case 10-2014. N. Eng. J. Med, 2014, 370: 1238-48.

27. **Kradin, RL,** Fidias P, Digumarthy SR, Mark EJ. 64-yo-man with chest pain and pleural effusion. Case 17-2014. 2014, N Eng J Med. 370:2132-40.

28. Shenoy, ES, Lai PS Shepard JA, **Kradin, RL**. Case 39-2015  A 22-Year-Old Man with Hypoxemia and Shock N Engl J Med 2015. 373:2456-2466\

29. Mansour M.K,.Ackman J.B., Branda J.A,, **Kradin R.L.**Case 32-2015  A 57-Year-Old Man with Severe Pneumonia and Hypoxemic Respiratory Failure N Engl J Med 2015; 373:1554-1564